**Slip Op. 03-**

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: SENIOR JUDGE RICHARD W. GOLDBERG

| | |
|---|---|
| FORMER EMPLOYEES OF ROHM AND HAAS COMPANY,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR,<br><br>　　　　　　　Defendant. | **PUBLIC VERSION**<br><br>Court No. 00-07-00333 |

[Labor's negative determination of eligibility for trade adjustment assistance is remanded.]

Dated: January 23, 2003

Barnes, Richardson & Colburn (Frederic D. Van Arnham, Jr., Tsiona Cohen), for the plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, and Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); and Office of the Solicitor, Division of Employment & Training Legal Service, United States Department of Labor (Stephen Jones), of counsel, for the defendant.

### MEMORANDUM OPINION AND ORDER

**GOLDBERG, Senior Judge:** This matter is before the Court on the plaintiffs' motion for judgment upon the agency record, pursuant to USCIT R. 56.1(c)(1). The plaintiffs, five former employees of Rohm and Haas, a manufacturer of specialty chemicals, challenge the denial by the United States Secretary of Labor ("Secretary") of their petition for trade adjustment

assistance ("TAA") under the Trade Act of 1974 ("'74 Act"), 19 U.S.C. § 2271 et seq. (2000).  The Court has jurisdiction pursuant to 19 U.S.C. § 2395(c) (2000) and 28 U.S.C. § 1581(d)(1) (2000).

The plaintiffs contest the Secretary's determination that the third criterion of Section 222 of the '74 Act, 19 U.S.C. § 2272(a)(3), was not satisfied because increased imports had not "contributed importantly" to the plaintiffs' loss of employment. For the reasons set forth below, the Court concludes that the Secretary's determination is not supported by substantial evidence and is not in accordance with law.  The Court remands the case to the United States Department of Labor ("Labor") for further investigation and redetermination of the plaintiffs' eligibility for TAA benefits.

## I.    BACKGROUND

### A.    The TAA Statute

The Trade Act of 1974 provides trade adjustment assistance to workers who have been partially or totally displaced as a result of increased imports.  Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 15 CIT 653, 654 (1991).  The Secretary must certify a group of workers as eligible to apply for trade adjustment assistance if she determines:

> (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

> (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and
>
> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof <u>contributed importantly</u> to such total or partial separation, or threat thereof, and to such decline in sales or production.

'74 Act § 222, 19 U.S.C. § 2272(a) (emphasis added).[1]

"Contributed importantly" is defined as a "cause which is important but not necessarily more important than any other cause."  19 U.S.C. § 2272(b)(1).  There must be an "important causal nexus" between increased imports and the decline in sales or production.  <u>Former Employees of Hewlett-Packard Co. v. United States</u>, 17 CIT 980, 985 (1993); <u>accord</u> <u>Former Employees of Kleinerts, Inc. v. Herman</u>, 23 CIT 647, 651, 74 F. Supp. 2d 1280, 1285 (1999) (explaining that "contributed importantly" requires a "direct and substantial relationship" between decrease in sales or production and increase of imports) (quoting <u>Estate of Finkel v. Donovan</u>, 9 CIT 374, 382, 614 F. Supp. 1245, 1251 (1985)).

## B.    The TAA Petition and Labor's Determination

The plaintiffs were employees in the Ion Exchange Resins

---

[1]  Congress recently made significant amendments to the TAA provisions of the '74 Act.  <u>See</u> Trade Adjustment Assistance Reform Act of 2002, Pub. L. No. 107-210, 116 Stat. 933 (Aug. 6, 2002); <u>see also</u> <u>infra</u> n.10.  Because the plaintiffs' petition antecedes November 4, 2002, the effective date of this amendment, <u>see</u> <u>id.</u> § 151, they cannot benefit from the more generous terms of the revised statute.

Unless otherwise specified, all references to any TAA statute denote the pre-amendment version of the that statute.

("IER") division of Rohm and Haas's Philadelphia plant until they were terminated on various dates from September 30, 1999, to December 31, 1999. On May 1, 2000, the plaintiffs filed a petition for TAA under the '74 Act, alleging that their terminations were part of a plan to move the bulk of the IER division's production to Rohm and Haas's plants in France and Mexico. See Confidential Administrative Record ("Conf. Admin. R."), at 28 (plaintiffs' TAA petition). In support of the petition, the plaintiffs attached an internal Rohm and Haas memorandum, dated February 29, 2000, which explained in part:

> Over the last year, Ion Exchange has been carefully reviewing its entire business . . . . One of the main conclusions is that the business must realize greater cost savings in production, meaning that product lines will have to be transferred to lower cost manufacturing sites. Therefore, after careful review of all our sites and production costs, the decision was made to transfer most of the IER product lines at the Philadelphia Plant to our IER manufacturing locations in France and Mexico.
>
> The IER production transfer from this plant will occur over the course of the next two years. It is planned that we will go from 160 manufacturing employees to between 60 and 70.

Conf. Admin. R., at 2. The petition alleged that layoffs related to this transfer of production began in 1999.

On March 3, 2000, prior to the filing of the plaintiffs' petition, the International Union of Operating Engineers Local No. 61 ("Union") filed a petition for TAA ("Union's '74 Act

petition") on behalf of its members.[2]  See Conf. Admin. R., at 1.
The Union's '74 Act petition cited the same Rohm and Haas
internal memo and made substantially the same allegations, but
stated that separation of affected workers would occur from April
2000 to December 2001.  Labor initiated an investigation of the
Union's '74 Act petition on March 13, 2000.

On March 4, 2000, the Union filed a separate petition under
19 U.S.C. § 2331 for NAFTA transitional adjustment assistance[3]
(the "Union's NAFTA petition"), based on the same facts
concerning the planned shift of production to Mexico.  On March
7, 2000, Labor referred the Union's NAFTA petition to the
Commonwealth of Pennsylvania's Department of Labor and Industry
("PDLI") for investigation.  The following day, PDLI faxed a
confidential data request form to Mr. George Schwartz
("Schwartz"), Rohm and Haas Human Resource Manager.  Schwartz
returned the form on March 14, 2000.  On the form, Schwartz
indicated that [

---

[2] The plaintiffs in this action are not members of the Union
and were not at the time the Union petition was filed.  Although
Labor stated in the Notice of Negative Determination of
Reconsideration on Remand that the Union's '74 Act petition did
encompass all workers at the plant, as a general matter a denial
of certification has no res judicata effect on subsequent
petitions, and Labor does not challenge the plaintiffs' standing
to bring this suit.

[3] The plaintiffs in this action did not apply for NAFTA
transitional adjustment assistance ("NAFTA TAA").  The Trade
Adjustment Assistance Reform Act of 2002 abolished NAFTA TAA as a
discrete program, effectively folding its provisions into 19
U.S.C. § 2272.  See Pub. L. No. 107-210, § 123, 116 Stat. 933.

].  See Conf. Admin. R., at 18-19.  Schwartz wrote a

question mark in response to a question concerning whether [

]₁ and did not answer another

question about whether [

].  Id. at 18.

The following day, PDLI issued its Preliminary Report of

State Findings denying eligibility for NAFTA adjustment

assistance, on the grounds that the shift in production to Mexico

had not yet occurred and that information provided by the company

revealed no current imports from Mexico or Canada.[4]  See Conf.

Admin. R., at 13-15.  One day later, on March 16, 2000, PDLI

transmitted its findings to Labor.  Included in the transmittal

was a one-paragraph typewritten document entitled "Additional

comments," signed by the PDLI investigator, which stated:

> Mr. Schwartz was not willing to return phone calls or
> to discuss the petition in much detail.  If he had
> eluded [sic] to the fact that the shift in production
> was not slated until next year this petition could have
> been delayed.  After finally talking with Mr. Schwartz
> and getting a better idea about what was going on I

---

[4]  PDLI specifically noted "that when the shift in
production does occur, the Union should either refile or ask for
consideration."  Conf. Admin. R., at 15.

> urged him to complete the bare minimum of questions on
> the data request sheet so we could make our
> determination.  It was felt that since the company has
> not had a lay-off and will not for sometime [sic], the
> production figures would be irrelevant.  If you still
> need this information, please let me know and I will
> obtain it from the employer.

Conf. Admin. R., at 17.

Labor's own investigator telephoned both the PDLI investigator and Schwartz on March 20, 2000, and was told by the latter that "no solid plans have been made as yet for any changes in the next several months (no earlier than fall of 2000)."  See Conf. Admin. R., at 20.  After one additional phone conversation with Schwartz, Labor's investigator issued her preliminary report, in which she concluded that [



].  See Conf. Admin. R., at 10.  She also noted Schwartz's statement that shifts in production would not occur before the fall of 2000. Id.

On April 18, 2000, Labor denied the Union's '74 Act petition, after concluding that the first criterion of Section 222 of the '74 Act, 19 U.S.C. § 2272(a)(1), was not met, because layoffs at the subject plant caused by the planned shift in production were not expected to occur in the next six months. The Union's NAFTA petition was contemporaneously denied.  Labor sent notice of the decision to the Union members the same day, but did not publish the negative determination in the Federal

Register until May 11, 2000.  See Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 65 Fed. Reg. 30,442, 30,443 (May 11, 2000).  On May 25, 2000, Labor sent each of the plaintiffs a form letter stating that their TAA petition was denied because they were a part of the same "worker group" as the Union, whose petition Labor had recently denied.

The plaintiffs filed suit in the Court of International Trade on July 11, 2000, seeking certification of eligibility for TAA or, in the alternative, a remand to Labor for further consideration.  On March 29, 2001, shortly after the plaintiffs moved for judgment upon the agency record, the Court granted Labor's motion for a voluntary remand.

Labor's remand investigation consisted of several contacts with Margaret Kaminski ("Kaminski"), a Rohm and Haas Human Resource Specialist, undertaken in response to a different TAA petition dated August 9, 2000, on behalf of the same worker group.[5]  In a letter dated October 17, 2000, Kaminski stated that (1) worker separations [

];  (2) Rohm and

---

[5]  That petition was subsequently denied.  See Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 65 Fed. Reg. 76,289, 76,289 (Dec. 6, 2000) (negative determination for TA-W-38,006).

Haas's IER production [

]; (3) that upon completion of the shift in production, the plants in Mexico and France would produce [

]; (4) upon completion of the shift in production, [

]; (5) Rohm and Haas's IER sales declined [

]⁶; (6) Rohm and Haas's production of IER products was exactly [

]⁷.  <u>See</u> Supp. Conf. Admin. R., at 1-2.  In marginalia and additional notes, the Labor investigator wrote that Kaminski stated that [

].  Supp. Conf. Admin. R., at 2-3.

---

[6]  The figures for the [

].

[7] The production figures for the [

].  As discussed <u>infra</u>, in n.13, this figure is inherently incredible and, in light of the PDLI investigator's instructions to Schwartz to "complete the bare minimum", casts substantial doubt on the overall accuracy of the production figures.

On June 21, 2001, Labor issued its Notice of Negative Determination of Reconsideration on Remand.  <u>See</u> Supp. Conf. Admin. R., at 4-6.  In contrast to its initial determination, when Labor had found that the plaintiffs failed to satisfy any of the three criteria of the TAA statute, Labor now determined that the first and second criteria were met because (1) the subject workers were threatened with employment declines, and (2) Rohm and Haas's IER sales had declined.  <u>Id.</u> at 5.  However, Labor concluded that the plaintiffs did not satisfy the third criterion, because

> [w]orker separations at the plant, that were scheduled to begin June 2000, are related to the transfer of the production of ion exchange resins to foreign sources during 2001.  Workers cannot be certified for TAA on the basis of a transfer of the production of articles to a foreign location.
>
> The company reports that it expects to import ion exchange resins, but those imports will not occur until 2002.

<u>Id.</u> at 5-6.  For these reasons, Labor affirmed the original negative determination.  On August 13, 2001, plaintiffs renewed their motion for judgment upon the agency record.

## II.  DISCUSSION

### A. Standard of Review

The Court will uphold a determination by the Secretary denying certification of eligibility for TAA that is supported by substantial evidence and is otherwise in accordance with law. <u>Former Employees of Barry Callebaut v. Herman</u>, 25 CIT __, __, 177

F. Supp. 2d 1304, 1308 (2001). However, "the [C]ourt, for good cause shown, may remand the case to [the] Secretary [of Labor] to take further evidence." 19 U.S.C. § 2395(b) (2000). "Good cause exists if the Secretary's chosen methodology is so marred that his finding is arbitrary or of such a nature that it could not be based on substantial evidence." Barry Callebaut, 25 CIT at __, 177 F. Supp. 2d at 1308 (quoting Former Employees of Linden Apparel Corp. v. United States, 13 CIT 467, 469, 715 F. Supp. 378, 381 (CIT 1989) (citations and internal punctuation omitted)). "Substantial evidence has been held to be more than a 'mere scintilla,' but sufficient enough to reasonably support a conclusion." Former Employees of Swiss Indus. Abrasives v. United States, 17 CIT 945, 947, 830 F. Supp. 637, 639-40 (1993) (citing Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987)). In addition, the "rulings made on the basis of those findings [must] be in accordance with the statute and not be arbitrary and capricious, and for this purpose the law requires a showing of reasoned analysis." International Union v. Marshall, 584 F.2d 390, 396 n. 26 (D.C. Cir. 1978); accord Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT __, __, 215 F. Supp. 2d 1345, 1350 (2002). When evaluating the evidence underlying Labor's conclusions, the Court may consider only the administrative record before it. International Union v. Reich, 22 CIT 712, 716, 20 F. Supp. 2d 1288, 1292 (1998). See also 28 U.S.C. § 2640(c).

**B.    Labor's Determination Is Not in Accordance with Law**

Labor's remand determination was marred by two incorrect assumptions that affected the course of its underlying investigation.  Labor first erred by considering only imports of IER products from Rohm and Haas's foreign plants in determining whether increased imports had contributed importantly to the workers' separations.  Even were that so, Labor also incorrectly assumed that this third requirement of Section 222 could not be satisfied unless Rohm and Haas had actually began importing its foreign-produced IER products into the United States.

1.    *Labor must investigate whether imports of IER products manufactured by third parties contributed importantly to Rohm and Haas's shift of production abroad.*

In focusing on future imports of Rohm and Haas's own foreign-produced IER products, Labor ignored the possibility of a casual link between <u>third-party</u> imports and Rohm and Haas's decision to shift the majority of its IER production abroad.  In other words, Labor failed to investigate whether increased imports of IER products from other manufacturers contributed importantly to a decline in sales or production of Rohm and Haas's domestically-produced IER products, causing the company to transfer production abroad and lay off workers at the Philadelphia plant.

It is true, as Labor noted, that workers are not eligible for TAA certification under the '74 Act merely because their company shifts production to another location.  "The transfer of

a corporate function for reasons not associated with import penetration does not entitle workers to certification for trade adjustment assistance." Former Employees of Health-Tex, Inc. v. United States Sec'y of Labor, 14 CIT 580, 581 (1990) (affirming denial of eligibility for TAA where firm's transfer of production from New York to North Carolina was part of cost-cutting plan resulting from debts associated with recent leveraged buyout, and not from foreign import pressures); see also Kleinerts, 23 CIT at 651-56, 74 F. Supp. 2d at 1285-89 (affirming denial of TAA certification where production declined due to loss of primary customer, and equipment transferred to foreign plant was not used to produce like products). As the Court of International Trade has previously observed, Congress intended the Secretary to deny certification when "another cause was so dominant that the separations . . . would have been essentially the same" regardless of the increase in imports. Miller v. Donovan, 9 CIT 473, 481, 620 F. Supp. 712, 719 (1985) (quoting S. Rep. No. 1298, 93d Cong., 2d Sess. 133 (1974), reprinted in 1974 U.S.C.A.A.N. 7186, 7275). Thus, in Miller the court affirmed the denial of TAA certification with respect to workers whose workplace was closed due to technological obsolescence. 9 CIT at 481, 620 F. Supp. at 719. See also S. Rep. No. 1298, reprinted in 1974 U.S.C.A.A.N. at 7275 ("[S]eparations that would have occurred regardless of the level of imports, e.g., those resulting from domestic competition, seasonal, cyclical, or technological

factors are not intended to be covered by the program.").

On the other hand, certification is required as a matter of law where Labor's investigation reveals that increased imports of articles like or directly competitive with those produced by the workers' firm have caused such direct economic distress to the firm that it is forced to relocate production abroad. Certification may be warranted where sales have already declined as a result of imports, though the firm has not yet begun to ramp down production in anticipation of or in response to the shift of production abroad.[8] For example, an increase in imports of like or directly competitive products from or to third parties could have a significant price-depressing impact on the market for a domestic firm's product.[9] If the domestic firm's foreign competitors enjoyed lower costs for factors of production (such as labor) than did the domestic firm, the market price for that good could reach a level below that at which the domestic firm could profitably produce the good. In the short term, the rational domestic firm would continue to produce and sell the good so long as it was able to cover its marginal costs of production. However, as this money-losing approach would be

---

[8] The statute does not require that a decline in both production <u>and</u> sales have occurred. <u>See</u> '74 Act § 222, 19 U.S.C. § 2272(a); <u>Swiss Indus.</u>, 17 CIT at 948, 830 F. Supp. at 640.

[9] An increase in the volume of imports, rather than an increase in their price, is all that is required for imports to be deemed to have "increased" under § 2272. <u>See</u> <u>Swiss Indus.</u>, 17 CIT at 950, 830 F. Supp. at 641.

untenable over the long run, the firm would eventually either have to cease production altogether, or take measures to lower its costs of production--as by shifting production abroad.  In the latter case, layoffs at the firms's domestic production facility could well begin to occur before the firm's foreign production had fully come on line, and long before the firm began re-importing its newly foreign-produced product.[10]  So long as

---

[10]  Labor appears to have fixated on the idea that because the NAFTA TAA statute expressly provides for eligibility upon a shift of production to a foreign location (Mexico or Canada), see 19 U.S.C. § 2331(a)(1)(B), and the '74 Act does not, see 19 U.S.C. § 2272, "[w]orkers cannot be certified for TAA [under § 2272] on the basis of the transfer of the production of articles to a foreign location," Supp. Conf. Admin. R., at 5-6 (Negative Remand Determination), except upon the reimportation by the domestic firm of the newly foreign-produced products.  Nothing in the statute supports such a restrictive reading.  The difference in the availability of TAA under § 2272 and § 2331 is that the a shift in production abroad alone is ipso facto sufficient to confer eligibility for NAFTA TAA, whereas § 2272 requires the existence of a causal nexus between increased imports of like articles on the one hand, and worker separations and a decline in the domestic firm's sales or production (as manifested by the shift abroad) on the other.  To the extent that certain language in Former Employees of Alcatel Telecommunications Cable v. Herman, 25 CIT __, __, 134 F. Supp. 2d 445, 449 (2001), adopts Labor's view of a simple dichotomy between NAFTA TAA and '74 Act TAA in this regard, the Court respectfully disagrees.

The Court further observes that, as noted supra n.1, Congress recently repealed NAFTA TAA, folding into a newly-revised version of the '74 Act.  Under the Trade Adjustment Assistance Reform Act of 2002, workers are eligible for adjustment assistance if, inter alia, the Secretary determines that the workers' firm has shifted production to any foreign country and "there has been or is likely to be an increase in imports" of like articles.  See Pub. L. 107-210, § 113, 116 Stat. 933 (Aug. 6, 2002).  See also H.R. Conf. Rep. No. 107-624, at 122 (July 26, 2002).  Clearly, the plaintiffs would qualify for TAA benefits under the most recent iteration of the TAA statute, if it applied to this case.

there is a direct causal nexus, the firm's decision to relocate its production abroad is functionally no different than a decision simply to cease production altogether--a paradigmatic case for TAA. See, e.g., Former Employees of Tyco Toys, Inc. v. Brock, 12 CIT 781, 782-83 (1988) (remanding for further investigation of TAA claim of workers whose plant had closed; evidence showed rising imports, and thus "an issue to be examined is whether [the domestic firm's] customers turned to imported products . . . [t]he fact that one cause of the plant's closing is unrelated to increased imports should not be determinative"); Former Employees of Baker Perkins v. United States, 13 CIT 632, 636 (1989) (remanding a case involving the transfer of production to another domestic plant for determination whether a closed-down plant would have continued operating in the absence of such a transfer, because "[w]ithout more specific information, it is not possible to conclude that this transfer was the cause of plaintiffs' separation rather than increasing imports"); cf. Former Employees of Hewlett-Packard Co. v. United States, 17 CIT 980, 985 (1993) (affirming denial of certification where Labor conducted a market survey and found no increase in like or directly competitive products; broad decline in prices due to "indirect competition" from imports of electronic equipment generally did not demonstrate requisite causal nexus). Under either eventuality, the increased imports will have contributed to the decline in sales or production of the domestic firm, and

the concomitant separation of workers.

In the instant case, Rohm and Haas explained that its decision to shift most IER production abroad was motivated by "tremendous cost and pricing pressures over the last decade, a condition that is not likely to change in the future." Conf. Admin. R., at 2 (Feb. 29, 2000 internal memo). Kaminski plainly stated that [

]. Supp. Conf. Admin. R., at 1.[11] She also indicated that recent declines in sales had occurred; [


]. It is certainly possible that other factors unrelated to increased imports, such as domestic competition or a downturn in the business cycle, could have accounted for the decline in sales. It is also possible that, for example, technological obsolescence of the Philadelphia plant was the impetus for Rohm and Haas's decision to shift product abroad. The Secretary did not make any such findings, however. Labor had an obligation to seek elucidation of such statements, particularly in light of Rohm and Haas's reluctance to be forthcoming. See Barry Callebaut, 25 CIT at __, 177 F. Supp. 2d at 1310-11 (2001) (unverified information furnished by a company

_____

[11] Labor's unsubstantiated speculation in its brief to the Court that Kaminski was referring to Rohm and Haas's own planned future imports is not plausible.

suspected of being "less than truthful" and contradicted by other data does not constitute substantial evidence). "Because of the ex parte nature of the certification process, and the remedial purpose of the [TAA] program, the Secretary is obliged to conduct [her] investigation with the utmost regard for the interest of the petitioning workers." Local 167, Int'l Molders & Allied Workers' Union v. Marshall, 643 F.2d 26, 31 (1st Cir. 1981); accord Marathon Ashland, 26 CIT at __, 215 F. Supp. 2d at 1350.

For these reasons, the Court will remand this case for further investigation as to whether increased imports of IER products contributed importantly to the actual or threatened separation of Rohm and Haas's IER division workers, and to the decline in sales or production of that division. On remand, Labor must consider four issues: (1) whether imports of IER products have increased[12]; if so, (2) whether such imports motivated Rohm and Haas's decision to shift the bulk of its IER production to foreign facilities and thus lay off workers in the IER division (i.e., whether imports were significantly causally connected to the layoffs); if so, (3) whether there was an

---

[12] The Court's discussion has focused on the possibility of third-party imports. However, the plaintiffs also alleged that Rohm and Haas had [
                                                            ]. In light of the question mark that Schwartz wrote in response to a question on this point, and the failure of Kaminski's responses to resolve the issue definitively, Labor should also clarify whether Rohm and Haas was [
        ].

important causal link between increased third-party imports and Rohm and Haas's recognized decline in sales, and; if not, (4) whether Rohm and Haas's production declined[13] and whether there was an important causal link between such decline and increased third-party imports.  If Labor determines that the answers to (1), (2) and either (3) or (4) are affirmative, it must certify the plaintiffs as eligible for TAA.

Thus, Labor should focus on both objective and subjective factors in conducting its remand investigation.  Labor should follow up on the statements by Rohm and Haas and its representatives about the reasons for the firm's decision to relocate its IER production abroad.  Because the company has proven itself not to be an enthusiastic participant, Labor should hesitate to take its assertions about its customers' purchasing decisions at face value.  See Barry Callebaut, 25 CIT at __, 177 F. Supp. 2d at 1310-11 (2001).  In deference to Labor's expertise, the Court will not specify any precise methodology. Labor might, however, consider surveying Rohm and Haas's

---

[13]  Although Labor determined that Rohm and Haas's production [                    ], this finding is not supported by substantial evidence.  The investigation with respect to this issue was marred from the beginning by the PDLI investigator's decision to urge Schwartz "to complete the bare minimum of questions," and by her apparent agreement with him that "the production figures would be irrelevant."  Although Labor ostensibly undertook its own inquiry with respect to the production figures, the fact that Kaminski [
                                                                    ]
suggests that these figures are not to be taken seriously.

customers to determine whether they increased their purchases of imports but kept purchases of the firm's domestically priced competitive products constant, and used the leverage of increased availability of imports to extract price concessions from the domestic firm.  See, e.g., International Union, 22 CIT at 718-22, 20 F. Supp. 2d at 1294-97 (approving use of "dual test"). Alternatively or additionally, Labor might review Rohm and Haas's price quotes or bid submissions to non-customers or conduct a market survey to determine whether, even if Rohm and Haas's own customers did not decrease their purchases from the firm, increased imports drove down prices, such that other purchasers of IER products bought from foreign manufacturers instead of from Rohm and Haas, and on such a scale that the company's only option was to shift production abroad.

> 2.    *Labor erred by predicating its investigation on the mistaken belief that imports of Rohm and Haas's foreign-produced IER products were required to precede worker separations or the threat thereof.*

Labor's determination that Rohm and Haas's imports of its own foreign-manufactured IER products had not commenced, and could thus not form the basis for TAA certification of the petitioners, is incorrect as a matter of law, and forms an independent basis for the Court to remand this matter.  Labor assumed that the causal link between increased imports and the separation of workers required by the statute necessarily requires that actual imports precede the plaintiffs' dismissals,

or the threat thereof. However, the Court of International Trade has previously considered and rejected this assumption in at least two cases.[14] In <u>Former Employees of Delco Systems Operations v. United States</u>, 11 CIT 825 (1987), the court considered the denial of a TAA petition of workers who had lost their jobs assembling gun turrets when their employer closed its domestic plant and shifted production to its Canadian facility. In remanding the case with instructions to determine whether the plaintiffs satisfied the third statutory criterion, the court observed:

> [The] decision to consolidate Delco's production of gun turrets with [related] facilities in Canada, suggest a strong connection between plaintiffs' separations and any subsequent increased imports. . . . Thus, <u>even if imports of the relevant product did not occur or increase until after plaintiffs' separation</u>, it still might be reasonable to conclude that, under the circumstances, increased imports contributed importantly to plaintiffs' separations.

<u>Id.</u> at 831 (emphasis added).

The Court of International Trade addressed the same issue even more thoroughly in the subsequent case of <u>Former Employees of Bell Helicopter Textron v. United States</u>, 18 CIT 323 (1994). The Court framed the "determinative issue" as "whether 19 U.S.C. 2272(a)(3) requires strict chronological obedience for certification, <u>i.e.</u> importation before separation." <u>Id.</u> at 327.

---

[14] As noted, <u>see</u> <u>supra</u> n.1, the Trade Adjustment Assistance Reform Act of 2002 expressly provides for TAA certification upon a shift in production abroad, so long as "there has been <u>or is likely to be</u>" imports of like articles.

The court began by observing that the statute requires a "causal nexus between increased import penetration and the workers' . . . separation.  A causal nexus exists where there is a direct and substantial relationship between increased imports and a decline in sales and production."  Id. (quoting Former Employees of Johnson Controls, Inc. Automotive Sys. Group v. United States, Slip Op. 92-114, at 3 (July 17, 1992)).  The court then stated that if the company separated the workers at its domestic facility "so that it could take advantage of higher profit margins by increasing imports from its Canadian facilities, the causal nexus is strong indeed."  Id. at 328.  The court noted that the availability of relief to workers merely threatened with separation suggested that Congress did not mean to impose a "sequential limitation[] on the [c]ourt's causal nexus analysis," id. at 328, 329, particularly in light of legislative history indicating that the purpose of TAA is "to provide relief to workers displaced by the availability of more competitive importations."  Id.  The court then explained that "[t]he effectiveness of the transitional unemployment assistance provided by the Act would be severely curtailed if the workers were obligated to wait until they were separated and until the imports that caused their separation started rolling in."  Id. at 329-30.  Accordingly, the court remanded the case with instructions to consider events that occurred after the separations, up to sixty days--the statutory deadline for the

Secretary's determination--after the date the petition was filed. Id. at 329. "[E]vents transpiring up to the statutory limit for the determination may be relevant and appropriate for consideration--<u>even if delivery is to occur after the period limit for the determination</u>." Id. (emphasis added).

Labor has not proffered any reasoned explanation of why the principle enunciated in <u>Delco Systems</u> and <u>Johnson Controls</u> does not control, either as an abstract principle of law or as applied to the specific facts of the instant case.[15] Whatever modest tension may exist between the use of perfective verbs in the statute and these cases' holdings that a strict chronological sequence is not necessary, the Court finds the reasoning underpinning these decisions to be sufficiently persuasive as to warrant fidelity to the principle of <u>stare decisis</u>.

The plaintiffs argue that because record evidence, <u>see, e.g.</u>, Conf. Admin. R., at 2-3, 10-11, 18-19; Supp. Conf. Admin. R., at 1-2, 3-5, suggests that Rohm and Haas decided to transfer most of its IER production to its France and Mexico facilities "<u>so that</u> it could take advantage of higher profit margins by

---

[15] Ordinarily, the Court defers to an agency's reasonable construction of a statute that it administers, to an extent consonant with the formality of the agency's interpretation. Ultimately, however, it is "the province and duty of the judicial department to say what the law is." <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177 (1803). As the Court of International Trade has already spoken to this issue, and Labor has offered no reasoned explanation why the CIT's prior holdings are in error, the Court will not depart from established precedent.

increasing imports from its [foreign] facilities, the causal nexus is strong indeed," <u>Bell Helicopter</u>, 18 CIT at 328, and thus the Court should enter a directed verdict in their favor.  Such evidence of motivation may be a necessary element of this exception to the requirement of a sequential causal relationship, but it is not sufficient.  The plaintiffs must still demonstrate that within the relevant time frame--i.e. within 60 days after filing of the petition--Rohm and Haas had "plans certain," <u>id.</u> at 330, to shift production abroad, and that separation of workers in the IER division was causally related to such plans.  Although the Court agrees that the evidence in favor of the plaintiffs appears strong, this determination is better left, in the first instance, to the Secretary of Labor.

### Conclusion

Because Labor's determination was neither supported by substantial evidence nor in accordance with law, the Court remands this case for further investigation of the plaintiffs' petition in a manner consistent with this opinion.  It is hereby ordered that Labor shall, within ninety (90) days of the date of this Order, issue the remand determination.

**SO ORDERED.**

_____
**Richard W. Goldberg**
**Senior Judge**

**Dated:      January 23, 2003**
**            New York, NY**