**Slip Op. 04-151**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| Former Employees of Electronic Data Systems Corp., | : | |
| | : | |
| Plaintiffs, | : | **Court No. 03-00373** |
| | : | **Before: Barzilay, Judge** |
| v. | | **Public Version** |
| | : | |
| United States Secretary of Labor, | : | |
| Defendant | : | |
| | : | |

Decided: December 1, 2004

*Yormick & Associates Co.,* (*Jon P. Yormick*) for Plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, (*Jeanne E. Davidson*), Deputy Director, (*Michael D. Panzera*), Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, *Stephen Jones,* Office of the Solicitor, United States Department of Labor, of counsel, for Defendant.

# OPINION

BARZILAY, JUDGE:    In this action, former employees of Electronic Data Systems Corporation, I Solutions Center, Fairborn, Ohio ("EDS"), Dan McGlinch, Ann M. Lett and Jodi McHargue ("Plaintiffs"), appeal from the determination of the United States Department of Labor ("Labor") denying their eligibility for trade adjustment assistance ("TAA") under section 222 of the Trade Act of 1974 ("the Act"), 19 U.S.C. § 2272 (West Supp. 2004).[1] *See Notice of*

---

[1]The relevant part of section 222 of the Trade Act of 1974, as amended, reads:
A group of workers . . . shall be certified by the Secretary as eligible to apply for adjustment assistance under this part . . . if the Secretary determines that--
**(1)** a significant number or proportion of the workers in such workers' firm, or an

*Negative Determs. for Worker Adjustment Assistance,* 68 Fed. Reg. 6210, 6211 (Dep't Labor

Feb. 6, 2003);  *Notice of Negative Determ. Regarding Application for Reconsideration,* 68 Fed.

Reg. 20180 (Dep't Labor Apr. 24, 2003) (hereinafter *Reconsideration Determination*).  Labor

denied certification on the grounds that Plaintiffs's firm did not produce an "article" as required

under section 222 of the Act.  This court finds that Labor's determination relies on incomplete

appropriate subdivision of the firm, have become totally or partially separated, or are threatened to become totally or partially separated; and
**(2)(A)(i)** the sales or production, or both, of such firm or subdivision have decreased absolutely;
**(ii)** imports of articles like or directly competitive with articles produced by such firm or subdivision have increased; and
**(iii)** the increase in imports described in clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision; or
**(B)(i)** there has been a shift in production by such workers' firm or subdivision to a foreign country of articles like or directly competitive with articles which are produced by such firm or subdivision; and
**(ii) (I)** the country to which the workers' firm has shifted production of the articles is a party to a free trade agreement with the United States;
**(II)** the country to which the workers' firm has shifted production of the articles is a beneficiary country under the Andean Trade Preference Act, African Growth and Opportunity Act, or the Caribbean Basin Economic Recovery Act; or
**(III)** there has been or is likely to be an increase in imports of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.

19 U.S.C. § 2272(a) (West Supp. 2004).  The language of the original section 222 was amended by section 113 of the Trade Adjustment Assistance Reform Act of 2002, a division of the Trade Act of 2002, Pub. L. No. 107-210, 116 Stat. 933 (Aug. 6, 2002), which added new provisions now in 19 U.S.C. § 2272(a)(2).  The amendments apply to petitions for certification "filed on or after the date that is 90 days after the date of enactment of this Act [Aug. 6, 2002]." *See* 19 U.S.C. prec. § 2271.  Thus, the effective date of the new provisions is November 2, 2002.  *See Former Employees of Rohm and Haas Co. v. Chao,* 27 CIT __, 246 F. Supp. 2d 1339,  1342-43 n.1 (2003) (citing Pub. L. No. 107-210, § 151).  Plaintiffs filed their application on December 27, 2002, and, therefore, the more generous terms of section 2272(a)(2)(B) not requiring any causal link between increased imports and petitioners' separation apply to Plaintiffs' petition.

factual findings and a flawed interpretation of the meaning of the term "article" within section 222 of the Act, and remands this action to Labor for further investigation.

## BACKGROUND

Plaintiffs are former employees of EDS who were separated from their employment on March 15, 2002 (Dan McGlinch) and April 3, 2002 (Ann M. Lett and Jodi McHargue). On December 27, 2002, they filed a petition for trade adjustment assistance under section 221(a) of the Act.[2] *See Petition Trade Adjustment Assistance for Workers at EDS*, Dec. 27, 2002, P.R. Doc. No. 2 at 3.[3] In their petition, Plaintiffs included an attachment for the section "products produced by affected group" stating that "[t]he production of the following products, required to provide computer application creation and support, was moved from Fairborn, Ohio to Juarez, Mexico: computer programs, job control language, database support and documentation, third party software support and documentation, program and job documentation, [and] project-oriented documentation." *Petition Trade Adjustment Assistance for Workers at EDS*, Dec. 27, 2002, P.R. Doc. No. 2 at 4. On January 15, 2003, Labor denied Plaintiffs' certification on the ground that Plaintiffs' firm did not produce an article as required under section 222 of the Act. *Notice of Negative Determ. Regarding Eligibility to Apply for Worker Adjustment Assistance, EDS,* TA-W-50,486, P.R. Doc. No. 7 at 17-18 (notice published at 68 Fed. Reg. 6210, 6211). In

---

[2]Codified at 19 U.S.C. § 2271, this section allows any "group of workers" to apply for adjustment assistance.

[3]There are two versions of the administrative record before the court: public and confidential. Citations to the public version of the administrative record are referred to by the names of the document, followed by "P.R. Doc. No." followed by the document number and then page number in the record. Citations to the confidential version of the record are as follows: name of the document, "C.R. Doc. No.", followed by the document number and then the page number within the record.

the petition for reconsideration of this determination, Plaintiffs added an additional paragraph to the attachment for the section "products produced by affected group," stating that "[w]ith the sale of these products to the customer, complete ownership of the products was transferred from EDS to the customer . . . includ[ing] all usage and Copyrights of the products." *Request for Admin. Reconsideration of the Denial of TAA for Workers of EDS*, Mar. 4, 2003, P.R. Doc. No.10 at 29.

In response to the petition, Labor initiated an investigation. Labor's initial investigatory work is memorialized in three forms: a verification guide, a confidential data request form and an investigative report. In the *Verification Guide,* Labor's formal comments on Plaintiffs' allegations regarding "layoffs/import impact/shift in production" included "[[        ]] company; moving services to [[        ]][4]. *Verification Guide*, TA-W-50,486, C. R. Doc. No. 4 at 10. In the *Confidential Data Request Response,* a response to a questionnaire sent by Labor to the EDS Human Resources Manager, an EDS employee described the business activities of EDS as "information technology" including several more detailed explanations. *Confidential Data Request Response*, Jan. 6, 2003, C.R. Doc. No. 5 at 14. In response to the question whether the firm's workers produce an article of any kind, the EDS employee replied: "No. They provide" certain other activities. *Confidential Data Request Response*, Jan. 6, 2003, C.R. Doc. No. 5 at 15. Labor's investigator made no further inquiry concerning the nature of the work done by Plaintiffs' firm. Using this information as conclusive evidence, Labor issued the negative determination. *See Investigative Report*, TA-W-50,486, C.R. Doc. No. 6 at 16. Following Plaintiffs' request for reconsideration of the negative determination, Labor took one additional

---

[4]Confidential information found in the confidential version of the administrative record has been redacted in this public version of the opinion.

step. It asked one of the Plaintiffs, [[        ]], to clarify. *Memo from Susan Worden, Apr. 8, 2003,* C.R. Doc. No. 11 at 30. This Plaintiff clarified that the computer program was custom-designed for the customer's operations. *Memo from Susan Worden, Apr. 8, 2003,* C.R. Doc. No. 11 at 30; *see Reconsideration Determination,* 68 Fed. Reg. 20180, P.R. Doc. No. 12 at 32 ("A petitioner . . . clarified that the subject firm created a custom-designed program for the customer's financial department."). Labor then determined that Plaintiffs' firm did not produce an "article" within the meaning of the Act. Labor denied certification concluding that "[t]he functions performed at the subject firm relate to information technology services. These services are thus not tangible commodities, that is, marketable products, and are not listed in the Harmonized Tariff Schedule of the United States, which describes all articles imported to the United States." *Reconsideration Determination*, 68 Fed. Reg. 20180. Relying on its interpretation of the Harmonized Tariff Schedule of the United States (HTSUS), 19 U.S.C. § 1202, Labor explained that "informational support that could historically be sent in letter form and that can currently be electronically transmitted are [sic] not listed in the HTS." *Id.* Plaintiffs now challenge Labor's determination regarding their eligibility for TAA before this court, specifically the finding that Plaintiffs' firm did not produce "articles" within the meaning of the Act.

### JURISDICTION AND STANDARD OF REVIEW

This Court has exclusive jurisdiction over civil actions arising from "any final determination by the Secretary of Labor . . . with respect to the eligibility of workers for adjustment assistance." 28 U.S.C. § 1581(d)(1) (2000). The Act provides for judicial review of Labor's final determination denying certification of aggrieved workers' eligibility for TAA. 19 U.S.C. § 2395(a) (West Supp. 2004). The agency's factual findings, "if supported by substantial

evidence, shall be conclusive; but the court, for good cause shown, may remand the case to such

Secretary [of Labor] to take further evidence." 19 U.S.C. § 2395(b).

The relevant statutes do not, however, provide guidance as to the standard of review for

Labor's legal determinations. *Former Employees of Murray Eng'g, Inc. v. United States Sec'y of*

*Labor*, 28 CIT __, Slip Op. 04-45, at 6 (May 4, 2004). This Court, therefore, considers whether

Labor's determination is "in accordance with law," a default standard outlined in the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See, e.g., Former Employees of Rohm*

*& Haas Co. v. Chao*, 27 CIT __, 246 F. Supp. 2d 1339, 1346 (2003); *Woodrum v. Donovan*, 5

CIT 191, 193, 564 F. Supp. 826, 828 (1983); *see also Alaska Dep't of Envtl. Conservation v.*

*E.P.A.*, 124 S. Ct. 983, 1006, 540 U.S. 461, __ (2004) ("Because the [relevant] Act itself does

not specify a standard of judicial review in this instance, we apply the familiar default standard of

the [APA]."). The APA requires federal courts to set aside an agency action that is not in

accordance with *any* law, "not merely those laws that the agency itself is charged with

administering." *F.C.C. v. NextWave Pers. Communications Inc.*, 537 U.S. 293, 300 (2003).

In this case, Labor made a legal determination based on its interpretation of the terms of

the HTSUS. While Congress has granted Labor the authority to "prescribe such regulations as

may be necessary to carry out the provisions" of the Act, 19 U.S.C. § 2320, Labor has not

promulgated any regulations explicating the meaning of the term "article" for purposes of TAA.

*See* 29 C.F.R. § 90.2.[5] Instead, Labor interprets the word "article" by referencing the HTSUS

and relying in part on the interpretation of the HTSUS by the U.S. Bureau of Customs and

---

[5]Labor's regulations largely restate the statutory requirements. *Former Employees of Murray Eng'g, Inc.,* Slip Op. 04-45 at 7 n.8; *cf.* 29 C.F.R. 90.16 *with* 19 U.S.C. §§ 2272-2273.

Border Protection ("Customs"). There is no indication that Congress intended for Labor itself to have authority to interpret the terms of the HTSUS.[6] *See Former Employees of Murray Eng'g, Inc.,* Slip Op. 04-45, at 7. Nor does Labor appear to possess any particular expertise in applying the HTSUS. *Id.* In addition, assuming *arguendo* that Labor has some independent authority to explicate terms of the HTSUS, Labor's determination in this case is more akin to a letter ruling by Customs. *Id.* at 8 n.10 (citing *United States v. Mead Corp.*, 533 U.S. 218, 221 (2001)). Thus, this Court need not grant *Chevron* deference to Labor's interpretation of the HTSUS. *Id.* at 7 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council. Inc.,* 467 U.S. 837, 842-43 (1984)). Still, Labor's determination may be able to claim respect "proportional to its 'power to persuade'." *See Mead*, 533 U.S. at 235 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) (Agencies charged with applying a statute "necessarily make all kinds of interpretive choices," and a "well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Id.* at 227.).

## DISCUSSION

### I. Labor's Legal Determination

The Court of Appeals for the Federal Circuit recently concluded that "[w]hile the definition of the statutory term 'production' is a question of law, the question whether particular

---

[6]Congress has granted the United States Bureau of Customs and Border Protection the authority to apply and interpret the HTSUS. *See* 19 U.S.C. 1500. The United States Customs Service was reorganized into the United States Bureau of Customs and Border Protection effective March 1, 2003. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308; Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 4 (2003).

employees are engaged in 'production' within that definition is factual." *Former Employees of Marathon Ashland Pipeline, LLC v. Chao*, 370 F.3d 1375, 1381 (Fed. Cir. 2004). The court also noted that because Labor in that case did not "explicitly construe the term 'production' in the adjustment assistance statute," it was unclear what deference could be accorded with respect to "an unarticulated, implicit construction of [that] term." *Id.* at 1382 n.2. In this particular case, Labor has provided some basis for its conclusion that "informational support" or "information technology services" do not involve "articles", but Labor's analysis is flawed and lacks sufficient power to persuade.

In support of its legal determination that Plaintiffs' company does not produce an article within the meaning of the Act, Labor relied in part on the treatment of computer software under the HTSUS. This recourse to the HTSUS is indeed sanctioned by the language of the Act, which consistently refers to "an article" as a dutiable item. *Former Employees of Murray Eng'g, Inc.,* Slip Op. 04-45, at 10 (citing 19 U.S.C. §§ 2119, 2252(d)(4)(B)-(C) (2000) (discussing "rate of duty on any article," "amount of duty with respect to any article," suspension of liquidation "with respect to an imported article," and imposition of duty "with respect to an imported article.")); *see also Gustafson v. Alloyd Co.,* 513 U.S. 561, 568 (1995) (elementary canon of statutory construction to give a term a "consistent meaning throughout the Act"). In addition, Labor's regulation indicates that Labor chose to reference the HTSUS in deciding what constitutes an article as a matter of law. *See* 29 C.F.R. § 90.11(c)(7) ("If available, the petition also should include information concerning the method of manufacture, end uses, and wholesale or retail value of the domestic articles and the United States tariff provision under which the imported articles are classified.").

Labor's recourse to the HTSUS in this case, however, was deficient because Labor attempted to categorize something as inclusive and general as "information technology services."[7] Labor's decision that "informational support that could historically be sent in letter form and that can currently be electronically transmitted are [sic] not listed in the HTS" suggests that Labor focused on the HTSUS's treatment of electronically transmitted computer programs. *See* General Note 3(I), HTSUS (exempting "telecommunications transmissions" from "goods subject to the provisions of the [HTSUS]"). Labor's focus leaves out certain other provisions of the HTSUS related to computer programs and eludes a meaningful construction of term "article."

The reading of the relevant HTSUS subheadings establishes that software or a computer program on a carrier medium is dutiable merchandise. *See, e.g.*, 8524.31.00, 8524.40.00, HTSUS. The duty imposed on software on a carrier medium by the HTSUS is determined based solely on the nature of the recording medium. *See* 8524, HTSUS. This Customs's valuation practice is also consistent with the notion that software on a carrier medium is an article or merchandise whose value is not determined by the intellectual property or data recorded on the media.[8] Department of the Treasury, Customs Service, *U. S. Valuation of Imported Carrier*

---

[7]Information technology is a very broad "field of engineering involving computer-based hardware and software systems, and communication systems, to enable the acquisition, representation, storage, transmission, and use of information." 9 *McGraw-Hill Encyclopedia of Science & Technology* 169 (9th ed. 2002). Thus, information technology includes both tangible and intangible components.

[8]The International Trade Administration, Department of Commerce, also adheres to the view that the transference of software on a carrier medium gives the subject merchandise the "undeniable characteristics of merchandise":

> Furthermore, the Department, while acknowledging the intangible elements of software, has focused its analysis on the tangibility of software when it is contained on a carrier medium. The Department believes that a tangible object which embodies intellectual property is merchandise. When the idea is transformed into instructions

*Media Bearing Data or Instructions for Use in Data Processing Equipment*, 50 Fed. Reg. 30558

(July 26, 1985) (reaffirming its previous position that software be valued only on the basis of the

value of the carrier medium). Customs has, in fact, classified computer programs and software in

the HTSUS depending on the media on which they are recorded. *See Headquarters Ruling*

("HQ") 960179 (Apr. 17, 1997) (classifying the software on a magnetic diskette in subheading

8524.99.40, HTSUS, which provides for "[r]ecords, tapes and other recorded media for sound or

other similarly recorded phenomena. . . .: [o]ther; [o]ther . . ."; while classifying the software on

CD-ROM discs "for a computer laser reading system creat[ing] image phenomena in the form of

graphic icons on the user's computer screens" was classified in subheading 8524.39.00, HTSUS,

which provides for "[r]ecords, tapes and other recorded media for sound or other similarly

recorded phenomena. . . : [d]iscs for laser reading systems: [o]ther. . . ." *Id.*).

Most importantly, under the HTSUS, the recording of a computer program on a carrier

medium results in a new article as evinced by a shift in tariff. *Compare* 8523, HTSUS

("Prepared unrecorded media for sound recording or similar recording of other phenomena") *with*

8524, HTSUS ("Records, tapes and other recorded media for sound or other similarly recorded

phenomena"). This indicates that the transference of software on a carrier medium gives the

---

and written into source code, processed into machine-readable object code by computer programs such as compilers and assemblers, and is embodied on a carrier medium, merchandise is created. Thus, the Department believes that it is reasonable to treat software on a carrier medium as merchandise subject to the countervailing duty law.

International Trade Commission, *Preliminary Affirmative Countervailing Duty Determ.: Certain Computer Aided Software Eng'g Products from Singapore,* 55 Fed. Reg. 1596, 1597 (Jan. 17, 1990).

medium a new value.[9]  Labor, thus, cannot reasonably argue based on the HTSUS that workers who produce and record software on a carrier medium are not engaged in production of a new and different article.  *See Nagy v. Donovan*, 6 CIT 141, 145, 571 F. Supp. 1261, 1264 (1983) ("[T]he term 'article,' as used in section 222(3) of the Trade Act of 1974, does not embrace activity by a worker that does not result in the creation or manufacture of a tangible commodity, or that does not cause the transformation of an existing product into a new and different article.")

Finally, Customs has declared that software modules transmitted electronically are "merchandise" and "goods," referring to certain dictionary definitions of these terms.  HQ 114459 (Sept. 17, 1998).  Notably, the Customs ruling letter concluded that the "fact that the importation of the merchandise via the Internet [was] not effected by a more 'traditional vehicle' (e.g., transported on a vessel)" did not affect the Customs' decision.  *Id.*  Customs further explained that because the subject computer modules were imported into the United States via the Internet, they were "exempted"[10] from duty under General Note 16, HTSUS, 19 U.S.C. §

---

[9] Software on a carrier medium is "similar to such items as books, newspapers, and magazines. Although most of the value of these items resides in the intangible component they contain, they are treated by Customs as merchandise." *Preliminary Affirmative Countervailing Duty Determ.: Certain Computer Aided Software Eng'g Products from Singapore*, 55 Fed. Reg. at 1598.

[10] The HTSUS is not clear on the significance of its "exemptions."  On the one hand, General Note 1, HTSUS, reads that "goods provided for in this schedule and imported into the customs territory of the United States from outside thereof . . . *are subject to duty or exempt therefrom as prescribed in general notes 3 through 18, inclusive.*"  HTSUS (emphasis added).  This could imply that electronically transmitted software is still merchandise but exempted from the tariff schedule.  On the other hand, General Note 3(e) states: "For the purposes of general note 1 . . . telecommunications transmissions . . . *are not goods subject to the provisions* of the tariff schedule."  HTSUS (emphasis added).  This, however, does not signify that everything in such exemptions escapes the definition of an article, because one of the exemptions in General Note 3(e) is "articles exported from the United States which are returned within 45 days after such exportation."  General Note 3(e)(e), HTSUS.

1202 (1998 ed.).  *Id.*

Although we give considerable weight to an agency's construction of a statutory scheme it is entrusted to administer, deference is still measured by the agency's care, formality, relative expertise, and the persuasiveness of the agency's position.  *Mead*, 533 U.S. at 228.  Labor's interchangeable use of "computer programs" and "information technology services" undermines its reasoning and renders its conclusion hardly discernible.  A thorough exploration of the HTSUS's treatment of computer programs shows that Labor's general conclusion regarding computer programs is neither persuasive nor careful.  Furthermore, Labor has not acquired expertise in interpreting the HTSUS to credit its position otherwise.

In its brief, Labor further relies on older case law to establish that the term "article," as used in section 222(3) of the Act, "does not embrace activity by a worker that does not result in the creation or manufacture of a tangible commodity."  *Nagy*, 6 CIT at 145-46, 571 F. Supp. at 1264-65 (holding that workers who performed splining of a hub did not produce an article because their work constituted service with respect to an already completed article).  Labor cites to the legislative history of the Trade Act of 1974 that reveals Congress's concern with trade imbalances in "labor intensive industries."  *See* Trade Act of 1974, S. Rep. No. 93-1298 (1974),

It should be noted that in the arena of international trade, the United States has purposefully exempted computer software products from duties.  Proclamation No. 7011, 62 Fed. Reg. 35909 (July 2, 1997) (to expand world trade in information technology products, 42 WTO members, including the United States, agreed to eliminate duties on information technology products, including computer software products); *see also The Technology Administration, Department of Commerce, Questions and Answers, Regarding Ambassador Hayes's Statement on Duty Free Treatment for Electronic Transmissions,* Feb. 19, 1998, *at* http://www.technology.gov/digeconomy/question.htm (last visited Nov. 30, 2004) ("In 1996, a working party of technical experts at the World Customs Organization considered the question of whether downloaded transmissions were to be considered 'imported goods.'  It was concluded that the question presented was a policy matter for national governments to decide.").

*reprinted in* 1974 U.S.C.C.A.N. 7186, 7197 ("The Nation's economy has continued its long, slow drift away from labor intensive industries and toward service industries. . . . This relative decline in manufacturing employment has been offset by increases in service jobs." *Id.*). While this court recognizes that the Trade Act of 1974 at its inception was designed to alleviate the plight of workers in labor intensive industries, the court finds that Labor's conclusion that information technology services generally do not involve production of any articles does not comport with the trade adjustment provisions.[11]

Furthermore, any rigidity in implementation of the statute would undermine the remedial nature of the Act. "The trade adjustment assistance statutes are remedial legislation and, as such, are to be construed broadly to effectuate their intended purpose." *Former Employees of Chevron Products Co. v. United States Sec'y of Labor*, 26 CIT __, 245 F. Supp. 2d 1312, 1318 (2002) (citing *Woodrum*, 5 CIT at 198, 564 F. Supp. at 832). When construing a statute, the duty of the court "is to give effect to the intent of Congress." *Flora v. United States*, 357 U.S. 63, 65 (1958). The court must seek to discern the legislative will, first, by reference "to the literal meaning of words employed." *Id.; see also Fortin v. Marshall*, 608 F.2d 525, 527 (1st Cir. 1979). Only "[i]f a literal meaning of the disputed provision does not answer the question presented, the court may look to the entire statutory scheme and to the provision's legislative history in an effort to resolve the ambiguity." *Woodrum,* 5 CIT at 194, 564 F. Supp. at 829. The language of the trade adjustment assistance provisions is not ambiguous, and this Court has agreed with Labor's

---

[11]It should be also noted that the Trade Adjustment Assistance Reform Act of 2002 created more generous terms, which under certain requirements do not require petitioners to prove that they lost their jobs directly as a result of an increase in imports of articles like or directly competitive with those produced by their firm. *See* 19 U.S.C. § 2272(a)(2)(B).

reading of the Act that the meaning of the word "article" is informed by the HTSUS.  *See Former*

*Employees of Murray Eng'g, Inc.,* Slip Op. 04-45, at 10.  This precludes any need to search

legislative history to discern Congressional intent.  Furthermore, this case also presents "the

familiar proposition that Congress need not, and likely cannot, anticipate all circumstances in

which a general policy must be given specific effect" and "changing circumstances" such as rapid

advances in technology should be treated consistent with Congress's general intent.  *United*

*States v. Haggar Apparel Co.,* 526 U.S. 380, 392-93 (1999).

　　　　While the definition of the statutory term "article" is a question of law, the question of

whether particular items produced by Plaintiffs would fall into this definition is factual.  *Cf.*

*Former Employees of Marathon Ashland Pipeline, LLC*, 370 F.3d at 1381.  Labor's legal

determination cannot be fully reviewed because Labor's analysis conflates "information

technology services" with "computer programs."  On remand, Labor is asked to explain and

support clearly its position with respect to the characterization of these computer programs as

articles or services, considering that the HTSUS treats software embodied in carrier medium as

articles subject to tariff.

## II.  Labor's Factual Determinations are Not Supported by Substantial Evidence

　　　　When evaluating the evidence underlying Labor's conclusions, the court may consider

only the record before it.  28 U.S.C. § 2640(c); *see Int'l Union v. Reich,* 22 CIT 712, 20 F. Supp.

2d 1288, 1292 (1998).  "While Labor has 'considerable discretion' in conducting its investigation

of TAA claims, 'there exists a threshold requirement of reasonable inquiry.  Investigations that

fall below this threshold cannot constitute substantial evidence upon which a determination can

be affirmed.'"  *Former Employees of Sun Apparel of Tex. v. United States Sec'y of Labor*, 28 CIT

__, Slip Op. 04-106 at 15. (Aug. 20, 2004) (internal citation omitted); *see also Former*

*Employees of Hawkins Oil and Gas, Inc. v. United States Sec'y of Labor,* 17 CIT 126, 130, 814

F. Supp. 1111, 1115 (1993) ("[N]o deference is due to determinations based on inadequate

investigations.").

It is incumbent on Labor to decide whether the petitioning group meets the requirements

for TAA eligibility. *See* 19 U.S.C. § 2273. Whether Plaintiffs' firm is engaged in the production

of articles is a question that requires sufficiently detailed factual information about the firm's

work. In this case, Labor's determination was not based on a meaningful description of the work

done by EDS. Plaintiffs' petition provided an inclusive list of items that raised questions about

their basic constitution, including tangibility. Labor's questionnaire did not elaborate on this

information, instead describing the business activities of EDS as "information technology," once

again using unspecific terminology. *See Confidential Data Request Response*, C.R. Doc. No. 5

at 14. Based on this scant evidence, Labor concluded that EDS did not produce any articles.

Labor also de-emphasized the importance of additional information in Plaintiffs' petition

for reconsideration that included the statement that with the sale of the product to the customer,

complete ownership of the products was transferred to its customer. *Request for Admin.*

*Reconsideration of the Denial of TAA for Workers of EDS,* Mar. 4, 2003, P.R. Doc. No.10 at 29.

While the "complete ownership of the products" is not determinative of whether the workers

were in fact involved in the production of an article, it suggests that the computer programs were

sold to the customer as products independent of any further maintenance and customer support.

Although Labor did take a further step by asking one of the Plaintiffs to clarify the *nature* of the

computer programs, this inquiry did not produce more useful detail. *See Memo from Susan*

*Worden, Apr. 8, 2003,* C.R. Doc. No. 11 at 30; *Reconsideration Determination,* 68 Fed. Reg.

20180, P.R. Doc. No. 12 at 32. This Plaintiff gave a very limited response explaining that the

computer programs were custom-designed for a customer's financial department. *See*

*Reconsideration Determination*, 68 Fed. Reg. 20180, P.R. Doc. No. 12 at 32. Labor's

investigation was aborted at this point. Labor included this last response in its decision denying

TAA certification without indicating the impact of that statement on its reasoning. In this

context, Labor's limited inquiry and the general nature of the responses from EDS simply do not

generate enough information to support Labor's determination regarding computer programs

with the requisite level of substantial evidence.

In addition, the list of products created by EDS included "database support and

documentation," "third-party software support and documentation," and "program and job

documentation," including "process and procedure documentation and support." *Petition Trade*

*Adjustment Assistance for Workers at EDS*, Dec. 27, 2002, P.R. Doc. No. 2 at 4. This list

indicates that Plaintiffs' firm was possibly producing printed material (such as brochures or

manuals accompanying computer programs) that could fall into one of the subheadings of

Chapter 49 of the HTSUS, Printed Books, Newspapers, Pictures and Other Products of the

Printing Industry; Manuscripts, Typescripts and Plans. *See, e.g.,* HQ 561520 (Jan. 11, 2000) (In

this case involving the classification of a software program, which included a pre-recorded CD-

ROM disk containing software, a pre-recorded floppy diskette containing license files, and a

ring-bound operations manual and installation guide, the manuals were classified in subheading

4901.99.0050.). If EDS produced documentation as a part of the product sold to the customer, it

is not a far-fetched inquiry to ascertain whether this documentation was composed of dutiable

articles under the HTSUS.  The record lacks any showing that Labor inquired into the nature and volume of the documentation produced.

Finally, Labor has relied on the legal conclusions of the EDS Human Resources official who completed the questionnaire.  "An unsupported conclusion simply does not suffice as a proper investigation." *Former Employees of Alcatel Telecomms. Cable v. Herman,* 24 CIT 655, 665 (2000) (not reported in F. Supp. 2d).  Labor relied on the statements of the EDS representative, who described the business activities of EDS as "information technology" including certain activities.  *Confidential Data Request Response*, C.R. Doc. No. 5 at 14.  It also relied on the representative's response that EDS did not produce articles, but provided computer related services.  In effect, Labor substituted one EDS employee's opinion that the company did not produce "articles" for its own legal inquiry as to whether the products produced by EDS constituted "articles" for the purposes of TAA statute.  No factual findings in the record support this conclusion.

Substantial evidence "requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable fact-finder." *Allentown Mack Sales and Service, Inc. v. N.L.R.B.,* 522 U.S. 359, 377 (1998).  The record in this case is not sufficient for a reasonable fact-finder to conclude that Plaintiffs' firm is solely engaged in service work, especially because the description of Plaintiffs' work includes production of items such as computer programs[12] and accompanying documentation.  Because

---

[12]The *McGraw-Hill Dictionary of Scientific and Technical Terms* defines [computer] program as a "detailed and explicit set of directions for accomplishing some purpose, the set being expressed in some language suitable for input to a computer, or in machine language." *McGraw-Hill Dictionary of Scientific and Technical Terms* 1680 (6th ed. 2003).  Relatedly, software is the "totality of programs usable on a particular kind of computer, together with the

the factual record is not sufficiently developed for complete judicial review, we remand this case

for further fact gathering.

**CONCLUSION**

On remand, Labor has two tasks. First, it must explain and support clearly its position

with respect to the characterization of the computer programs at issue as articles or services.

Since the HTSUS and its interpretation by Customs support the position that the transference of

software on a carrier medium creates a new article, Labor's reasoned analysis will have to take

this into account.

Second, because Labor failed to thoroughly investigate Plaintiffs' claims, its

determination is not supported by substantial evidence on the record. On remand, Labor shall

conduct a thorough investigation into Plaintiffs' claims. In particular, Labor shall: (1) determine

whether computer programs were embodied in any medium when transferred to customers; (2)

explain the significance of custom-designed computer programs as opposed to mass produced

computer programs; (3) identify what type of documentation was produced by EDS (brochures,

manuals, etc.); (4) determine what was the production volume of such documentation and

whether it was considered a part of the product purchased by EDS's customers; and (5) with

respect to each finding made in its determination, state with specificity the facts relied upon in

reaching such finding, including specific references to documents in the record.

---

documentation associated with a computer program, such as manuals, diagrams, and operating instructions." *Id.* at 1967. However, in common usage, software also "refers to the *medium* that stores input and output data as well as computer programs." *Advent Sys. Ltd v. Unisys Corp.*, 925 F.2d 670, 674 (3d Cir. 1991) (emphasis added) ("The medium includes hard disks, floppy disks, and magnetic tapes." *Id.*).

Labor's remand determination is due on January 31, 2005. The parties's comments are due on March 2, 2005, and replies to such comments shall be submitted on March 14, 2005.

/s/ Judith M. Barzilay

Dated: December 1, 2004
     New York, NY

_____
Judith M. Barzilay, Judge