**Slip Op. 05-148**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| Former Employees of Electronic Data Systems Corp., | : | |
| | : | |
| Plaintiffs, | : | **Court No. 03-00373** |
| | : | **Before: Barzilay, Judge** |
| v. | | **Public Version** |
| | : | |
| United States Secretary of Labor, | | |
| | : | |
| Defendant | : | |
| | : | |

## OPINION

[Upon Plaintiff's USCIT R. 56.1 motion for judgment on the agency record, the case is remanded to the Department of Labor with instructions.]

Dated: November 14, 2005

*Yormick & Associates Co.* (*Jon P. Yormick*), for the plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, (*Patricia M. McCarthy*), Assistant Director, Commercial Litigation Branch, Civil Division, U. S. Department of Justice *Michael F. Bahler* and (*Michael D. Panzera*), *Stephen Jones*, Office of the Solicitor, U. S. Department of Labor, of counsel, for the defendant.

Barzilay, Judge:    This case is before the court on Plaintiffs' USCIT R. 56.1 motion for judgment upon the agency record challenging the Department of Labor's denial of certification for trade adjustment assistance ("TAA") on remand. *See Electronic Data Systems Corporation: Notice of Negative Determination on Remand*, SAR 21-32 (Jan. 31, 2005) ("*Remand Determination*"). Plaintiffs, the former employees of Electronic Data Systems Corporation, I Solutions Center, Fairborn, Ohio ("EDS"), urge this court to order the Secretary of Labor to

certify Plaintiffs for TAA. On first remand, this court found that Labor's determination denying TAA benefits was not supported by substantial evidence and not in accordance with law. Labor was instructed to compile more evidence about the type of work that the Plaintiffs' firm was engaged in and "to explain and support clearly its position with respect to the characterization of the computer programs at issue as articles or services." *Former Employees of Elec. Data Syss. Corp. v. U.S. Sec'y of Labor*, Slip. Op. 04-151 (Dec. 1, 2004) (hereinafter "*EDS I*"). Upon review of Labor's remand results, Plaintiffs' comments and other submissions, the court finds that while Labor's factual investigation resulted in a sufficiently developed record, with certain exceptions that will need to be addressed on remand, Labor has failed to explain and legally support its position why the particular software produced by Plaintiffs was not an "article" within the meaning of the TAA statute.

## BACKGROUND

Plaintiffs, the affected worker group, were separated from their employment with the EDS Fairborn facility in March-April 2002 after the production of computer programs, job control language, database support and documentation, and other related work was moved from Fairborn, Ohio, to Juarez, Mexico. *Petition Trade Adjustment Assistance for Workers at EDS*, Dec. 27, 2002. Labor denied Plaintiffs' petition for TAA on the grounds that the EDS Fairborn facility did not produce an article. *Notice of Determination Regarding Eligibility to Apply to Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance*, 67 Fed. Reg. 64,922 (Oct. 22, 2002); *Negative Determination Regarding Eligibility to Apply for Worker Adjustment Assistance, EDS Fairborn*, TA-W-5-486, 68 Fed. Reg. 6211 (Feb. 6, 2003). After Plaintiffs' request for administrative reconsideration was denied, Plaintiffs brought this action

before the court challenging Labor's denial of TAA on May 28, 2004. On Plaintiffs' motion on

the agency record, this court remanded the case with the following instructions:

> First, [Labor] must explain and support clearly its position with respect to the
> characterization of the computer programs at issue as articles or services . . . .
> Second, because Labor failed to thoroughly investigate Plaintiffs' claims, its
> determination is not supported by substantial evidence on the record . . . . Labor
> shall conduct a thorough investigation into Plaintiffs' claims. In particular,
> Labor shall: (1) determine whether computer programs were embodied in any
> medium when transferred to customers; (2) explain the significance of custom-
> designed computer programs as opposed to mass produced computer programs;
> (3) identify what type of documentation was produced by EDS (brochures,
> manuals, etc.); (4) determine what was the production volume of such
> documentation and whether it was considered a part of the product purchased
> by EDS's customers; and (5) with respect to each finding made in its
> determination, state with specificity the facts relied upon in reaching such
> finding, including specific references to documents in the record.

*EDS I*, at 18. Familiarity with *EDS I* is presumed.

Labor conducted a remand investigation to determine whether the subject worker group

met the criteria in the Trade Act of 1974 for TAA certification as primarily-affected workers.

*See EDS Fairborn; Notice of Negative Determination on Remand*, 70 Fed. Reg. 6730-01 (Feb.

8. 2005). Labor's information request sought "to ascertain whether the work performed by the

petitioning worker group was mass replicated on a physical carrier medium, such as books,

manuals, CD-Rom, or diskette, and if so, whether there was an increase in imports or shift in

production of articles like or directly competitive with those produced by [the EDS Fairborn

facility]." *Id.* at 6731; *see Letter with Attached Questionnaire*, Dec. 17, 2004, *Confidential

SAR*[1], at 5.

---

[1]   There are two versions of the supplemental administrative record before the court: public and
confidential. This opinion contains citations to the confidential record designated as
*Confidential SAR*, followed by the page number within the record.

The record establishes that EDS workers who lost their jobs produced and maintained computer software and related documentation for one client's computer systems. *Confidential SAR*, at 15. [          ][2]. The information supplied by EDS shows that the Fairborn facility employees performed two roles in supporting financial systems software of its single client. *Confidential SAR*, at 12. [          ]. In addition to one principal client, EDS also had some other clients requiring "special projects." *Confidential SAR*, at 12. EDS' response did not delve into the nature of those projects.

EDS's reply established that software developed by EDS Fairborn was installed into a data center and was accessible to the EDS's client through certain terminals. *Confidential SAR*, at 12. [          ]. In addition, certain supporting materials were accessible to the client in electronic format and were occasionally provided in hard copies only at the client's request. *Confidential SAR*, at 12. EDS did not provide information about the volume of documentation given to the client in hard copies. This information is supported by statements of individual EDS former and current employees. [          ]. *See Confidential SAR,* at 2-3.

In the remand order, the Court directed Labor to "identify what type of documentation was produced by EDS (brochures, manuals, etc.)," and to "determine what was the production volume of such documentation and whether it was considered part of the product purchased by EDS's customers." *EDS I*, at 18. In the *Remand Determination*, Labor found that the supporting documentation was rarely sent to the client in hard copy because it was chiefly printed by a third-party copy facility when requested in rare instances by the client. In its

---

[2]   The information supplied by EDS describing specific tasks performed by Plaintiffs is confidential and therefore redacted from this public version of the opinion.

questionnaire response regarding means of delivery of the product to the client, EDS explained that its work products were usually delivered to the client electronically, either by e-mail or through common electronic repositories. *Confidential SAR*, at 12. Two of the petitioners confirmed that the code was almost always delivered electronically. *Confidential SAR*, at 18, 19.

Based on these newly compiled facts, Labor concluded that EDS "performed information technology services supporting financial systems software for a single client." *Remand Determination*, 70 Fed. Reg. at 6731. Labor focused on the finding that the software and documentation designed and/or supported by the workers of the subject facility was rarely delivered to the client on a physical carrier medium, but was installed onto a mainframe data center, which the client could access remotely and print if necessary. *Id.* at 6731. Labor concluded that the evidence established that the workers of the subject facility did not produce an article within the meaning of the Trade Act, nor did they support the production of an article either directly or through an appropriate subdivision of EDS.

### JURISDICTION AND STANDARD OF REVIEW

This Court has exclusive jurisdiction over civil actions arising from Labor's determinations "with respect to the eligibility of workers for adjustment assistance." 28 U.S.C. § 1581(d)(1) (2004). Labor's determination denying certification of eligibility for TAA will be upheld only if it is supported by substantial evidence on the record and is otherwise in accordance with the law. *See* 19 U.S.C. § 2395(b) (2004); *Int'l Union v. Reich*, 22 CIT 712, 716, 20 F. Supp. 2d 1288, 1292 (1998).

When reviewing Labor's conclusions of law, the court will consider whether they are "in accordance with the statute and not . . . arbitrary and capricious, and for this purpose the law requires a showing of reasoned analysis." *Former Employees of Ericsson, Inc. v. United States Sec'y of Labor*, Slip Op. 04-130, 2004 WL 2491651, at * 2 (CIT Oct. 13, 2004); *EDS I*, at 6. Under this standard, the court "will sustain the agency's interpretation of the statute where it has a rational basis in law, even though the court might have reached a different interpretation." *Abbott v. Donovan*, 6 C.I.T. 92, 100-101, 570 F. Supp. 41, 49 (1983). However, "the court will reject the agency's interpretation or application of a statute when it is inconsistent with the legislative purpose of the statute or frustrates Congress' intent." *Id*. at 101. "[I]t is for the courts, to which the task of statutory construction is ultimately entrusted, to determine whether or not administrative interpretations are consistent with the intent of Congress and the words of the Act." *Woodrum v. Donovan*, 5 CIT 191, 194, 564 F. Supp. 826, 829 (1983).

The central issue in this case is Labor's legal definition of the term "articles" that appears in the TAA statute.[3]   *See* 19 U.S.C. § 2272 (a) (West Supp. 2004).  Although Labor has

---

[3]   The relevant part of section 222 of the Trade Act of 1974, as amended, reads:
> A group of workers . . . shall be certified by the Secretary as eligible to apply for adjustment assistance under this part pursuant to a petition filed under section 2271 of this title if the Secretary determines that –
> (1) a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become totally or partially separated, or are threatened to become totally or partially separated; and
> (2)(A)(i) the sales or production, or both, of such firm or subdivision have decreased absolutely;
> (ii) imports of articles like or directly competitive with articles produced by such firm or subdivision have increased; and
> (iii) the increase in imports described in clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision; or

not defined the term "articles" in its regulations, it has defined the meaning of the terms "like or

directly competitive" – the adjectives that modify the term "articles" in the statute immediately

following it.  In determining whether Commerce's interpretation of the statute is in accordance

with law, the court applies the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Res. Def.*

*Council Inc.*, 467 U.S. 837, 842-43 (1984).  First, the court evaluates as a matter of law

"whether Congress's purpose and intent on the question at issue is judicially ascertainable,"

using "traditional tools of statutory construction."  *Timex V.I., Inc. v. United States*, 157 F.3d

879, 881 (Fed. Cir. 1998).  If the statute's plain language addresses the issue, "that is the end of

the matter."  *Id.*  If the statute's language is silent or ambiguous with respect to that issue, the

court evaluates the reasonableness of Commerce's interpretation of the statute.  *Koyo Seiko Co.*

*v. United States*, 36 F.3d 1565, 1573 (Fed. Cir. 1994).  Commerce's reasonable interpretation of

the statute is accorded deference, even if the court finds another permissible interpretation.  *Id.*

Labor's regulations are subject to *Chevron* analysis.

    Labor also chose to interpret the meaning of the term "articles" by referencing the

HTSUS and by relying in part on the interpretation of the HTSUS by the U.S. Bureau of

---

(B)(i) there has been a shift in production by such workers' firm or subdivision to a foreign country of articles like or directly competitive with articles which are produced by such firm or subdivision; and
(ii)(I) the country to which the workers' firm has shifted production of the articles is a party to a free trade agreement with the United States;
(II) the country to which the workers' firm has shifted production of the articles is a beneficiary country under the Andean Trade Preference Act, African Growth and Opportunity Act, or the Caribbean Basin Economic Recovery Act; or
(III) there has been or is likely to be an increase in imports of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.
19 U.S.C. § 2272(a).

Customs and Border Protection ("Customs"). As explained in *EDS I*, Labor's interpretation of the HTSUS merits only *Skidmore* deference – that is, it merits respect "proportional to its 'power to persuade.'" *EDS I*, at 7 (citing *United States v. Mead Corp.*, 533 U.S. 218, 221 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## DISCUSSION

### 1. Labor's Factual Inquiry

Labor has considerable discretion in conducting its investigation of TAA certification applications. *Former Employees of Computer Sci. Corp. v. Sec'y of Labor*, 28 CIT ＿ , 366 F. Supp. 2d 1365, 1371 (2004). Labor's investigation has to demonstrate a reasonable inquiry and the resulting factual record should establish with sufficient detail the nature of TAA petitioners' work prior to their separation. *See EDS I*, at 14-15; *Former Employees of Sun Apparel of Tex. v. United States Sec'y of Labor*, 28 CIT ＿, Slip Op. 04-106 at 15 (Aug. 20, 2004) (internal citation omitted); *see also Former Employees of Hawkins Oil and Gas, Inc. v. United States Sec'y of Labor*, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993) ("[N]o deference is due to determinations based on inadequate investigations."). On remand in this case, Labor conducted a comprehensive investigation into the nature of work done by the Fairborn facility employees, and the court can discern from the record what type of work was performed by Plaintiffs' firm. EDS Fairborn principally performed two roles: first, designing and developing various computer program applications with supporting materials for a single client and, second, maintenance work of its client's computer systems. Labor's conclusion that EDS did not provide brochures, manuals, or other printed materials to the client is supported by substantial evidence, even

though there is also evidence of EDS printing supporting documentation in certain instances when requested by the client.

Labor's investigation, however, was insufficient regarding the evidence that EDS had other clients in addition to the one principal client. Labor did not follow up on what type of "special projects" were done by EDS for those clients. This line of inquiry is relevant, however, because Labor maintains that EDS produced software custom-made for a single client and, therefore, inherently unique. Labor thus argues that such software cannot be "like or directly competitive" with other software as required by the TAA provisions. *See Remand Determination,* 70 Fed. Reg. at 6732. Labor cannot make this conclusion without investigating what kind of "special projects" were produced for other clients and requesting information comparing various "projects" that EDS produced.

### 2. Labor's Legal Conclusions

In *EDS I*, the court requested that Labor provide a reasoned analysis in support of its legal conclusion that computer programs or software are not articles. *EDS I*, at 18. Labor's remand results include an explanation of how software embodied on a physical medium is an article, but lack any reasoned analysis concerning software transmitted electronically to the client. Labor avoided answering this court's instruction to explain and support clearly its position with respect to the characterization of the computer programs at issue as articles or services by focusing on how the computer programs produced by EDS did not fit into its theory that only software embodied on a physical medium are "articles" contemplated by the TAA provisions.

Labor's remand determination focuses on its analysis of how the computer programs produced by EDS were rarely delivered to the client on a physical carrier medium. *See Remand Determination*, 70 Fed. Reg. at 6731. Indeed, the record supports Labor's finding that computer programs designed and developed by the EDS workers at the Fairborn facility were normally installed onto a mainframe data center from which the client could access them remotely. *See Confidential SAR*, at 12. Labor noted that even though software on CDs was sometimes created at EDS Fairborn, it was not a normal operation of the production. *Remand Determination*, 70 Fed. Reg. at 6731. Labor observed that the subject facility's client owned the intellectual property rights to the software and documentation designed and supported at EDS Fairborn, so that EDS could not have incorporated that work product into products for other clients, without explaining the significance of this notion to its interpretation of the definition of the term "articles" in the relevant statute.

Labor's explanation that software not embodied on a physical medium as an end-product (such as on a CD-Rom) is not an article hinges entirely on its unexplained position that the design and development of software is a service. Labor considers only software that is mass replicated on physical media (such as CDs, tapes, or diskettes), widely marketed, commercially available (e.g., packaged "off-the-shelf" programs) and dutiable under the Harmonized Tariff Schedule of the United States ("HTSUS") to be an article for the purposes of TAA certification requirements. *Remand Determination*, at 27. Labor characterizes those workers who design and develop such products as engaged in services supporting the production of an article. *Id.*

Labor supports this position, stating that it is consistent with the classification of computer programs and software in the HTSUS depending on the media on which they are recorded. *Id.* (citing HTSUS heading 8524.) While tangible software cannot be treated as a service based on the apparent provisions in the HTSUS, it is less clear whether intangible software is not an article by virtue of being exempted from tariff provisions via General Note 3(I), HTSUS, exempting "telecommunications transmissions" from "goods subject to the provisions of the [HTSUS]." Labor's conclusion is vitiated by its failure to explain Customs' ruling that software modules transmitted electronically are "merchandise" and "goods," referring to certain dictionary definitions of these terms, but exempted from tariff provisions via General Note 3(I). *See* HQ 114459 (Sept. 17, 1998). Notably, the Customs ruling letter concluded that the "fact that the importation of the merchandise via the Internet [was] not effected by a more 'traditional vehicle' (e.g., transported on a vessel)" did not affect Customs' decision. *Id.* The court explicitly raised as a relevant factor that Customs, which has the authority to interpret and apply the provisions of HTSUS, found that software modules transmitted electronically were merchandise benefitting from HTSUS' duty free provisions. *See EDS I*, at 11. Labor's remand results failed to address this Customs' ruling that software that is electronically transmitted is duty free merchandise. Such a conclusion seriously undercuts Labor's reliance on the HTSUS for its legal interpretation.

In addition, Labor's conclusion that software transmitted electronically is not an article is inconsistent with the International Trade Commission's ("ITC") interpretation of the term "article" in a related statute. The ITC has treated software, regardless of whether imported on a

carrier medium or electronically, as an article for purposes of section 337 of the Tariff Act of

1930, 19 U.S.C. § 1337 (2004).  *See In re Certain Hardware Logic Emulation Systems and*

*Components Thereof, Inv.* No. 337-TA-383, Commission Opinion on Remedy, the Public

Interest, and Bonding (U.S.I.T.C., March 30, 1998), *available at* 1998 WL 307240.  Section 337

of the Tariff Act of 1930 provides relief to United States industries from unfair methods of

competition arising from importation and employs the term "articles" in its operational

language.[4]  It prohibits

> 1) "[u]nfair methods of competition and unfair acts in the *importation of
> "articles"*.
>
> 2) "the sale of [certain] "articles" . . . the threat or effect of which is (i) to destroy
> or substantially injure an industry in the United States; (ii) to prevent the
> establishment of such an industry; or (iii) to restrain or monopolize trade and
> commerce in the United States; and
>
> 3) the importation of "articles" that infringe a patent, copyright, trademark, mask
> work, or protected design.

19 U.S.C. § 1337 (emphasis added).

---

[4]   Section 337 of the Tariff Act of 1930 and Section 222 of the Trade Act of 1974 are codified
under Title 19 of the United States Code.  The Trade Act of 1974 was an outgrowth of, and
provided amendments to, the Tariff Act of 1930, ch. 497, 46 Stat. 590 (1930).  The Trade Act of
1974 was enacted to liberalize the eligibility requirement for the U.S. Trade Adjustment
Assistance program, first authorized by the Trade Expansion Act of 1962.  Legislative history
shows that the Trade Expansion Act of 1962 grew out of Tariff Act of 1930.  *See generally
United Shoe Workers of Am. v. Bedell*, 506 F.2d 174, 179-85 (D.C. Cir. 1974) (tracing legislative
history of Trade Expansion Act.).  Section 337 of the Tariff Act was itself amended by the Trade
Act of 1974.  *See* Pub. L. 93-618, Title III, section 341(a), 88 Stat. 2053 (1975).
    Section 337 investigations conducted by the ITC most often involve claims regarding
intellectual property rights, including allegations of patent infringement and trademark
infringement by imported goods.

After ruling that the respondents' software violated section 337 of the Tariff Act, the ITC made a distinction between software on a carrier medium and electronically transmitted software, and chose to prohibit the former infringing software by an "exclusion order," and the latter by a "cease and desist" order.[5]  However, the purpose and effect of the two orders are equivalent.  Both orders prohibit importation of the infringing software.  Importantly, remedies under section 337 are available only when there are unfair practices resulting from the importation of "articles."  Therefore, regardless of the form of the order, ITC's decision to prohibit the importation of electronically transmitted software demonstrates that electronically transmitted software is capable of infringing domestic software, and thus an "article" for the purpose of section 337 of the Tariff Act.

The ITC has the authority to determine what constitutes an "article."  19 U.S.C. § 1332(a) (2004).  Labor has acknowledged that the ITC has such broad powers.  *See* Def. Br. at 30, *Former Employees of IBM v. Sec'y of Labor*, 29 CIT __, 387 F. Supp. 2d 1346 (2005) (citing 19 U.S.C. § 1332(a)) ("Congress has delegated broad authority to the ITC to determine what constitutes an 'article' for the purposes of Title 19 of the United States Code . . . . Congress

_____

[5]   The primary remedy available in section 337 investigations is "an exclusion order" that directs Customs to stop infringing imports from entering the United States.  In addition, the Commission may issue "cease and desist orders" against named importers and other persons engaged in unfair acts that violate Section 337.  Trade Remedy Investigation, International Trade Commission, *available at* http://www.usitc.gov/trade_remedy/int_prop/index.htm; *see also* 19 U.S.C. §1337 (d)-(f) (2004).  Unlike an exclusion order, which is enforced by the U.S. Customs Service, a cease and desist order is an in personam order typically directed to a party in the United States and is enforced by the Commission, not Customs.  *In re Certain Hardware Logic Emulation Systems and Components Thereof, Inv.* at 31 n.121.  The Commission's purpose in issuing a cease and desist order in patent-based cases has been to afford complete relief to complainants where infringing goods are already present in the United States, and thus cannot be reached by issuance of an exclusion order.  *Id.*

mandated that the ITC develop HTSUS to resolve all questions relative to the classification of articles in the several sections of the Customs law.").

The same term cannot have different meanings in related statutes. *See, e.g.*, *Terry v. Principi*, 340 F.3d 1378, 1385 (Fed. Cir. 2004) (citing *Tyler v. Cain*, 533 U.S. 656, 662 (2001)) ("When [courts] construe a statute, [they] do so in the setting of the statutory scheme of which it is a part."). Because Labor has not presented its position on this issue, the court will give another opportunity to explain and reconcile its definition of the term "articles" with that of the ITC. On remand, Labor should consider the ITC's determination that electronically transmitted software is an "article" for the purposes of section 337 when construing the term "articles" for purposes of the TAA provisions, as both sections are found in Title 19 and have appeared in the same legislative acts.

Labor also supports its position arguing that the definition of "like or directly competitive" that modifies the term "articles" in the TAA statute contemplates tangibility. *Def. Resp. Pl.s' Comments*, at 5. The TAA statute provides relief to those workers who produce articles and lose their jobs due to increases in imports or a shift in production of articles "like or directly competitive" with those produced at the workers' firm. Labor's regulation states: "[l]ike or directly competitive means that like articles are those which are substantially identical in inherent or intrinsic characteristics (i.e., materials from which the articles are made, appearance, quality, texture, etc.); and directly competitive articles are those which, although not substantially identical in their inherent or intrinsic characteristics, are substantially equivalent for commercial purposes (i.e., adapted to the same uses and essentially interchangeable therefor)."

29 C.F.R. § 90.2 (2004). However, the government does not account for the fact that even though computer programs are written in a particular language, they operate only through a tangible medium. In other words, any computer program or software functionally has physical manifestations and, based on these physical qualities, can be compared with other software products. In addition, software does not exist without a carrier medium. While it can be *transmitted* electronically, it must be ultimately stored on *some* carrier medium, such as a CD-Rom, floppy disk, hard drive, or the machine on which it is installed. In the present case, the computer programs were stored in computerized repositories that had shared access between EDS and its client. Labor's current position on this issue is not persuasive because ultimately the product, however transmitted, has the same function and use.

Such interpretation of the term "articles" would depart from this Court's definition of the same term more than twenty years ago, *see Nagy v. Donovan*, 571 F. Supp. 1261, 1263 (CIT 1983) ("the term 'article' . . . does not embrace activity by a worker that does not result in the creation or manufacture of a tangible commodity, or that does not cause the transformation of an existing product into a new and different article."). Indeed, here Labor is confronted with a familiar problem: how to apply existing law to new facts and technology. Fitting computer programs and software into an existing legal framework is ongoing in several areas of the law. *See, e.g.*, *S. Cent. Bell Tel. Co. v. Barthelemy*, 643 So. 2d 1240, 1247-48 (Sup. Ct. La. 1994) (finding that switching system and data processing computer software licensed to and used by a regional telephone company qualified as "tangible personal property" subject to "municipal sales and use tax", regardless of "form of delivery" of software - - magnetic tape or electronic transfer

via modem – because "[t]he software must be stored in physical form on some tangible object somewhere."); *Creasy Sys. Consultants, Inc. v. Olsen*, 716 S.W.2d 35, 36-37 (Sup. Ct. Tenn. 1986) (holding that computer programmers' fabrication of custom-made new programs or modification of existing software for client on client's computer constituted "sale of tangible personal property" within definition of statute defining activities subject to "sales tax."). Technological advances present the kind of "changing circumstances" that the courts have been able to account for in carrying out Congressional intent. *See United States v. Haggar Apparel Co.,*526 U.S. 380, 392-93 (1999).

Labor's second basis for finding that EDS did not produce articles as contemplated by the TAA statute involves the statutory requirement that articles whose production is shifted or increased be *like or directly competitive* with those produced by the petitioning worker group. Labor explained that "[s]oftware that is custom designed to meet the constantly changing needs of an individual client is an inherently unique product," and, therefore, cannot be considered "like or directly" competitive with other custom designed software under the definition of this term in 29 C.F.R. § 90.2. *Remand Determination*, 70 Fed. Reg. at 6732. Labor, however, does not explain how the software currently developed in the EDS facility in Juarez, Mexico, for the same client's systems is not "like" those programs designed and developed at the Fairborn facility for the same client's systems, in the absence of evidence that the client's systems are now different. The record suggests that the new facility in Mexico is engaged in the same type of work that was conducted at the EDS's Fairborn facility. That workers at the Fairborn facility designed and developed software to enhance the existing systems of its single client does not

mean that the software now developed in Mexico is not like the software produced by EDS Fairborn.

Additionally, Labor's argument is not persuasive because EDS could potentially have more than one client with similar needs in terms of computer programs. The record suggests that the Fairborn facility also had additional clients for whom it created "special projects." *Confidential SAR*, at 12. This information was not sufficiently investigated by Labor and disregarded in its Remand Determination. Because Labor's argument on "custom-made" software is premised on its finding that there was only one client, the record showing that there was more than one client cannot support Labor's conclusion. Labor's argument loses its power if considered in the context of custom-made products in more traditional industries. For example, custom-made suits are imported from abroad to the United States frequently. Arguably, one custom-made suit would be considered as like or directly competitive with another custom-made suit because both suits share substantial similarities and serve a particular demand.

Labor has also maintained that an article must have a value that makes it "marketable, fungible and interchangeable for commercial purposes to be subject to a duty on a tariff schedule." *Remand Determination*, at 28. However, Labor does not explain how a custom-made product is not interchangeable with another for commercial purposes.

## CONCLUSION

Labor failed to follow the court's entire instructions on its remand determination. While its factual investigation resulted in a developed record, with the exception that Labor did not inquire into the work done by EDS for other clients, Labor's legal conclusions fall short of a

reasoned analysis and fail to account for the ways other United States agencies have treated the term "articles" in applying the provisions of their pertinent statutes. This case is therefore remanded again to Labor with the following instructions: 1) Labor needs to ascertain what kind of work was done by EDS for its other clients (i.e., Labor should follow up on the evidence that EDS performed "special projects" for its other clients) and 2) Labor must provide a reasoned explanation in accordance with the law to explain why software not sold to the client on a physical medium, that is not canned software, is not an article. This analysis should take into account the existing interpretation of the term "articles" by the ITC and Customs.

Dated:     November 14, 2005                                  /s/ Judith M. Barzilay
            New York, NY                                        Judith M. Barzilay, Judge