Slip Op. 06-163

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                       :
FORMER EMPLOYEES OF TESCO              :
TECHNOLOGIES, LLC,                     :
                                       :
            Plaintiffs,                :
                                       :    Before: Judith M. Barzilay, Judge
      v.                               :    Court No. 05-00264
                                       :    Public Version
UNITED STATES SECRETARY OF             :
LABOR,                                 :
                                       :
            Defendant.                 :
_____:
```

## OPINION

[Case remanded to Department of Labor.]

Dated: November 9, 2006

(*Gary G. Mosey*), Pro Se, for Plaintiffs Former Employees of Tesco Technologies, LLC.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director; (*Patricia M. McCarthy*), Assistant Director; (*Dawn S. Conrad*), Commercial Litigation Branch, Civil Division, United States Department of Justice; *Clarette H. Yen*, Office of the Solicitor, United States Department of Labor, of counsel, for Defendant United States Secretary of Labor.

**BARZILAY, JUDGE:** Plaintiffs, Former Employees of Tesco Technologies, LLC, bring suit to challenge the United States Secretary of Labor's ("Labor" or "the Agency") denial of Plaintiffs' certification of eligibility to apply for Trade Adjustment Assistance ("TAA"). *See Tesco Technologies, LLC, Headquarters Office, Auburn Hills, Michigan; Notice of Negative Determination on Remand*, 70 Fed. Reg. 45,438-01 (Dep't Labor Aug. 5, 2005) ("*Negative Remand Determination*"); *Tesco Technologies, LLC, Headquarters Office, Auburn Hills, MI;*

*Notice of Negative Determination on Reconsideration*, 70 Fed. Reg. 3228-01 (Dep't Labor Jan.

21, 2005) ("*Negative Reconsideration Determination*").  For the reasons given below, the case is

remanded to the Department of Labor.

## I. Procedural History

On August 19, 2004, Plaintiffs, who [[     ]] filed for TAA certification, alleging that they

lost their jobs due to outsourcing of their design work to India.[1]  C.R. 7; *see* C.R. 9, 52–53.[2]

Labor issued a negative determination on September 27, 2004, after it concluded that Tesco's

customers had not increased foreign purchases of production and assembly line equipment

during the relevant time period and that Tesco had not shifted production of such equipment

abroad.[3]  *See Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment*

*Assistance*, 69 Fed. Reg. 62,460-01, 62,460 (Dep't Labor Oct. 26, 2004).[4]  On October 22, 2004,

Plaintiffs requested administrative reconsideration of the determination, which Labor granted on

December 7, 2004.  *See Tesco Technologies, LLC, Headquarters Office, Auburn Hills,*

*Michigan; Notice of Affirmative Determination Regarding Application for Reconsideration*, 69

Fed. Reg. 76,017-03 (Dep't Labor Dec. 20, 2004).  On completion of its cursory investigation,

---

[1]Although Plaintiffs worked for Tesco Technologies, LLC ("Tesco"), their group worked solely on GM programs.

[2]"C.R." refers to the confidential administrative record.  References to non-confidential portions of the administrative record will cite to the public record, "P.R."

[3]Labor focused on assembly line equipment purchases and production instead of the equipment designs because the Agency initially did not consider the designs a "product."  *See* C.R. 53.

[4]The court notes that in a letter dated September 2, 2004, Labor informed Tesco of Plaintiffs' TAA application and ostentatiously demanded that "*all data* [requested as part of the investigation] *be received not later than September 3, 2004.*"  C.R. 18.

Labor again denied Plaintiffs' application for TAA certification because it found that GM had

not outsourced work to India.[5]  *See Negative Reconsideration Determination*, 70 Fed. Reg. at

3228.  Plaintiffs then appealed to this Court.

On May 25, 2005, the court granted Labor's motion for voluntary remand so that it could

clarify the basis for the *Negative Reconsideration Determination* and its prior determinations.  In

its remand results, Labor treated Plaintiffs' designs as "articles," but concluded that Plaintiffs did

not meet the TAA certification requirements set forth in 19 U.S.C. § 2272 since

> the designs created by [Plaintiffs] are *not mass-produced* but rather adhere to the
> customer's specifications and accommodate the specialized processes or program
> needs dictated by the customer.  Accordingly, *there are no articles which are
> "like" or "directly competitive" to those designs* created by Tesco Technologies
> because each design is a unique engineering solution which is created for the sole
> purpose of satisfying a specific customer's particular need.  Thus, there are no
> articles which, for commercial purposes, are essentially interchangeable or can be
> adapted to the same use as a Tesco Technologies design.

*Negative Remand Determination*, 70 Fed. Reg. at 45,439 (emphasis added).

---

[5]The court queries why Labor treated the production patterns of GM as dispositive and ignored the actions of Tesco during the relevant period.  Furthermore, speaking with only two GM employees over the phone and gleaning little information for a reconsideration determination does not qualify as the substantial evidence expected to support Labor determinations.  *See Former Employees of Merrill Corp. v. United States*, 29 CIT __, __, 387 F. Supp. 2d 1336, 1345 (2005) ("While Labor has wide latitude in conducting its investigations, it must make a reasonable inquiry.  If Labor fails to undertake a reasonable inquiry, the investigation cannot be sustained upon substantial evidence before the Court.  Further, this Court owes Labor no deference if its investigation was inadequate.") (internal citations omitted); *Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor*, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993) ("[A]lthough Labor possesses considerable discretion in handling trade adjustment assistance investigations, there exists a threshold requirement of reasonable inquiry.  Investigations that fall below this threshold cannot constitute substantial evidence upon which a determination can be affirmed.").

## II. Jurisdiction & Standard of Review

This Court has exclusive jurisdiction over civil actions arising from Labor's determinations "with respect to the eligibility of workers for adjustment assistance." 28 U.S.C. § 1581(d)(1). It will uphold Labor's denial of TAA eligibility certification only if the determination is supported by substantial evidence and otherwise in accordance with law. *See* 19 U.S.C. § 2395(b). As the relevant statutes do not provide guidance as to the standard of review for Labor's legal determinations, *see Former Employees of Murray Eng'g, Inc. v. U.S. Sec'y of Labor*, 28 CIT __, __, 346 F. Supp. 2d 1279, 1282 (2004), this Court, therefore, considers whether Labor's determination is "in accordance with law," a default standard outlined in the Administrative Procedure Act, 5 U.S.C. § 706. *See Former Employees of Elec. Data Sys. Corp. v. U.S. Sec'y of Labor*, 28 CIT __, __, 350 F. Supp. 2d 1282, 1286 (2004) ("*EDS I*"); *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496–97 (2004) ("Because the [relevant] Act itself does not specify a standard of judicial review in this instance, we apply the familiar default standard of the [APA]."). The court also must consider whether Labor's legal conclusions are reached through "a showing of reasoned analysis" by the agency. *Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor*, 28 CIT __, __, 2004 WL 2491651, at *2 (2004) (not reported in F. Supp.) (quoting *Former Employees of Rohm & Haas Co. v. Chao*, 27 CIT __, __, 246 F. Supp. 2d 1339, 1346 (2003) (quoting *Int'l Union v. Marshall*, 584 F.2d 390, 396 n.26 (D.C. Cir. 1978))) (quotations omitted). Where Labor's analysis has "'a rational basis in law,'" the court must sustain its interpretation "even though the court might have reached a different interpretation." *Abbott v. Donovan*, 6 CIT 92, 100, 570 F. Supp. 41, 49 (1983).

Nevertheless, "the court will reject the agency's interpretation or application of a statute when it is inconsistent with the legislative purpose of the statute or frustrates Congress' intent." *Id.* at 101, 570 F. Supp. at 49.

When the court examines whether Labor's statutory interpretations and regulations are in accordance with law, it must employ the two-step test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). First, the court must examine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, the Agency and the court must comply with the clear intent of Congress, *see id.* at 842–43; if it has not, "the court must defer to [Labor's] construction of the statute so long as it is permissible." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000).

### III. The TAA Program

Congress initiated the TAA program in 1962 "in the belief that the special nature of employment dislocation resulting from changes in trade policies necessitated a level of worker protection" in addition to state unemployment programs. S. Rep. No. 93-1298, at 131 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7186, 7273; *see Former Employees of BMC Software, Inc. v. U.S. Sec'y of Labor*, 30 CIT __, __ n.5, Slip Op. 06-132, at 5–6 n.5 (Aug. 31, 2006) (not reported in F. Supp.). These concerns arose from the fact that "[i]ncreases in imports of a . . . product can . . . have a particularly severe effect on employment. Because entire industries . . . may be adversely affected, workers may not have any realistic opportunity to find new employment which is at all related to the skills and training they may have accumulated over many years." 1974 U.S.C.C.A.N. at 7273; *see also Former Employees of Chevron Prods. Co. v. U.S. Sec'y of*

*Labor*, 27 CIT __, __, 298 F. Supp. 2d 1338, 1349–50 (2003) (summarizing policy behind TAA

program); *Former Employees of Bell Helicopter Textron v. United States*, 18 CIT 323, 328–29

(1994) (not reported in F. Supp.) (same).

By 1974, though, it became clear that the program had "not been very effective," so

Congress revamped TAA to "ease[ the] qualifying criteria and . . . streamline[ the] petitioning

process. It [was] the intention . . . that workers displaced by increased imports receive all the

benefits to which they are entitled in an expeditious manner." 1974 U.S.C.C.A.N. at 7273; *see*

*Int'l Union*, 584 F.2d at 395 ("A primary purpose of the Trade Act of 1974 was to make worker

adjustment assistance more readily available . . . ."); *see also Former Employees of BMC*

*Software, Inc.*, Slip Op. 06-132, at 5–6 n.5.

Along with reiterating the purpose of the TAA during the amendment process, Congress

modified the criteria to determine who can benefit from the program. To be eligible for trade

adjustment assistance, two things are required.[6] First, "a significant number or proportion of . . .

_____

[6]In relevant part, the controlling statute states that:
(a) In general
A group of workers (including workers in any agricultural firm or subdivision of
an agricultural firm) shall be certified by the Secretary [of Labor] as eligible to
apply for adjustment assistance under this part . . . if the Secretary determines that–

> (1) a significant number or proportion of the workers in such workers'
> firm, or an appropriate subdivision of the firm, have become totally or
> partially separated, or are threatened to become totally or partially
> separated; and

> (2)     (A)(i) the sales or production, or both, of such firm or subdivision
> have decreased absolutely; (ii) imports of articles like or directly
> competitive with articles produced by such firm or subdivision have
> increased; and (iii) the increase in imports described in clause (ii)
> contributed importantly to such workers' separation or threat of
> separation and to the decline in the sales or production of such firm
> or subdivision; or
> (B)(i) there has been a shift in production by such workers' firm or
> subdivision to a foreign country of articles like or directly

workers in [a] firm [or its] subdivision" must have "totally or partially" lost their jobs. 19 U.S.C.

§ 2272(a). Next, Labor must determine whether one of the two following categories applies to

these workers: (1) the firm's sales or production must have fallen; imports of articles like or

directly competitive with articles the firm produced must have increased; and this increase must

have contributed importantly to the workers' loss of employment, as well as the decline in the

firm's sales or production. *See id.* Otherwise, (2) the workers' firm must have shifted

production of articles like or directly competitive with its domestically produced articles to a

foreign country, and there must have been or will likely be an increase in imports of articles like

or directly competitive with articles that the firm domestically produced. *See id.* Petitioners

who cannot fulfill these requirements may not receive TAA certification. *See Former*

*Employees of Shaw Pipe, Inc. v. U.S. Sec'y of Labor*, 21 CIT 1282, 1285, 988 F. Supp. 588, 591

(1997). While formulating its determination, however, Labor is to be mindful that the TAA laws

"should be construed broadly to effectuate [their] purpose" because they serve a "remedial

purpose." *United Shoe Workers of Am. v. Bedell*, 506 F.2d 174, 187 (D.C. Cir. 1974); *see*

*Former Employees of BMC Software, Inc.*, Slip Op. 06-132, at 9 (citing *Int'l Union*, 584 F.2d at

396; *Fortin v. Marshall*, 608 F.2d 525, 526, 529 (1st Cir. 1979); *Usery v. Whitin Mach. Works,*

*Inc.*, 554 F.2d 498, 500, 502 (1st Cir. 1977)); *cf.* 1974 U.S.C.C.A.N. at 7273, 7275.

---

competitive with articles which are produced by such firm or subdivision; and (ii) . . . (III) there has been or is likely to be an increase in imports of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.

19 U.S.C. § 2272(a).

## IV. Discussion

### A. The Parties' Contentions

Plaintiffs claim that Labor should reverse its decision in the *Negative Remand Determination* and certify Plaintiffs as eligible for TAA benefits because the production of the articles they produced was outsourced to India at the request of GM.  *See* Pl.'s Mot. J. A.R. 3. "The work was sent from Tesco via satellite to India and then back to Tesco where the more skilled designers and checkers would then correct it.  The plan instituted by General Motors is that as the Indian designers became more astute, Tesco workers could be eliminated."  Pl.'s Mot. J. A.R. 3.

Labor concedes that Plaintiffs' machinery and tool designs qualify as articles for TAA purposes.  *See* Def.'s Mot. J. A.R. 4.  It also concedes that "'a significant number or proportion of'" the Plaintiffs "'bec[a]me totally or partially separated,'" thereby satisfying the requirement set out in § 2272(a)(1).  Def.'s Mot. J. A.R. 8 (quoting 19 U.S.C. § 2272(a)(1)).  Consequently, according to Labor, "'[t]he only issues at hand . . . are whether there was a shift of production abroad of articles like or directly competitive with those produced by Tesco . . . and whether there were increased imports of articles like or directly competitive with those created at Tesco.'"  Def.'s Mot. J. A.R. 8 (quoting *Negative Remand Determination*, 70 Fed. Reg. at 45,439) (brackets in original).  With respect to this last set of factors, the court notes that Labor previously found that GM "[[    ]]"  C.R. 53.

Labor, however, contends that Plaintiffs do not qualify for TAA certification because "'the designs created by [Plaintiffs] *are not mass-produced* but rather adhere to [GM's] specifications and accommodate the specialized processes or program needs dictated by [GM]."

Def.'s Mot. J. A.R. 8–9 (quoting *Negative Remand Determination*, 70 Fed. Reg. at 45,439)

(emphasis added).  "Since every design is 'a unique engineering solution' developed to meet a

'specific customer's particular need,' any designs developed abroad are simply incapable of

being '*like or directly competitive*' with those created by [Plaintiffs].  Any designs created

abroad are not '*like or directly competitive*' because they are *not*, for commercial purposes,

'essentially interchangeable' nor 'can [they] be adapted to the same use as'" a design produced

by Plaintiffs.  Def.'s Mot. J. A.R. 9 (quoting *Negative Remand Determination*, 70 Fed. Reg. at

45,439) (first & second emphases added) (final brackets in original); *see* Def.'s Mot. J. A.R.

11–12.  Therefore, Plaintiffs allegedly cannot meet the criteria listed in 19 U.S.C. § 2272(a)(2).

**B. Analysis**

The Department of Labor bases its stance on the wording of § 2272(a)(2) and its

interpretation of that subsection's terms "like" and "directly competitive," as promulgated in 29

C.F.R. § 90.2.[7]  *See* Pl.'s Mot. J. A.R. 11.  That regulation, which takes its language directly

from the relevant legislative history, defines "like" and "directly competitive" as

> mean[ing] that like articles are those which are substantially identical in inherent
> or intrinsic characteristics (i.e., materials from which the articles are made,
> appearance, quality, texture, etc.); and directly competitive articles are those
> which, although not substantially identical in their inherent or intrinsic
> characteristics, are substantially equivalent for *commercial purposes* (i.e., adapted
> to the same uses and essentially interchangeable therefor).

29 C.F.R. § 90.2 (emphasis added); *see* 1974 U.S.C.C.A.N. at 7265–66.

---

[7]Although Congress explicitly restricted TAA benefits to workers displaced by the importation of "like or directly competitive" products or a shift in production of "like or directly competitive" products overseas, it did not provide definitions for "like" or "directly competitive."  *See* 19 U.S.C. § 2272(a)(2).  To discern the meaning of "like" and "directly competitive" within the statute, Labor issued 29 C.F.R. § 90.2, which the court finds to be a reasonable construction of the term.  *See Chevron, U.S.A., Inc.*, 467 U.S. at 843.

### 1. The "Mass-Production" Requirement

Despite its regulation, here Labor imposed an additional requirement – that the article be mass-produced – that is not consistent with either the statute or regulation and is therefore not in accordance with law.[8] *See Negative Remand Determination*, 70 Fed. Reg. at 45,439; Def.'s Mot. J. A.R. 8–9 (stressing that because "the designs created by [Plaintiffs] are not mass-produced," Plaintiffs' application for TAA certification must fail) (quoting *Negative Remand Determination*, 70 Fed. Reg. at 45,439); *see also* C.R. 81.  *Compare Negative Remand Determination*, 70 Fed. Reg. at 45,439, *with* 19 U.S.C. § 2272(a)(2); 29 C.F.R. § 90.2.  Congress did not legislate that Labor should certify only workers from mass-production facilities and uniformly deny TAA benefits to workers whose jobs require the high level of skills, training, and expertise to produce articles such as custom-tailored machine and tool designs.  *See Former Employees of Merrill Corp. v. United States*, 29 CIT __, __, 387 F. Supp. 2d 1336, 1345 ("[T]he Trade Act does not limit eligibility to only those 'articles' produced by manufacturing facilities.  Rather, the Trade Act embraces all 'articles' regardless of the source of production.").  In fact, highly specialized, labor-intensive jobs are some of those positions most likely to be outsourced to countries with lower labor costs, since the technical abilities of specialized workers place a substantial wage premium on their labor.  Contrary to Labor's contention, Plaintiffs comprise the very type of workers for whom Congress implemented the TAA program.[9]  *See* 1974 U.S.C.C.A.N. at 7273

---

[8]Although Labor has periodically invoked this mass-production requirement in its evaluation of TAA cases, the Court never has determined the validity of this criterion with respect to whether productions are "like" or "directly competitive."

[9]That Congress meant for the TAA program to aid workers in sectors normally not associated with industrial production also undermines Labor's reasoning.  *See, e.g.*, 19 U.S.C. § 2272(a) (including "workers in any agricultural firm or subdivision of an agricultural firm" within scope of workers eligible for TAA); 1974 U.S.C.C.A.N. at 7266 ("The term 'industry'

("Because entire industries . . . may be adversely affected, workers may not have any realistic opportunity to find new employment which is at all related to the skills and training they may have accumulated over many years.").

Similarly, on prior occasions, Labor has certified workers who produced custom-made, one-of-a-kind articles. *See, e.g.*, *Electronic Data Systems Corporation, I Solutions Center, Fairborn, Ohio; Notice of Revised Determination on Remand*, 71 Fed. Reg. 18,355-02, 18,357 (Dep't Labor Apr. 11, 2006) (granting TAA application eligibility to software producers who wrote new, customized code for GM Acceptance Corporation) ("*EDS Determination*"); *see also Former Employees of Elec. Data Sys. Corp. v. U.S. Sec'y of Labor*, 408 F. Supp. 2d 1338, 1343 (2005) (noting that Labor determined that EDS workers produced custom-made software for single client) ("*EDS II*"). In the present case, the Agency has provided no explanation for this policy deviation as the law requires. *See Sec'y of Agric. v. United States*, 347 U.S. 645, 652–53 (1954); *Brit. Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997). The court thus finds the "mass-production" requirement for TAA certification eligibility not in accordance with law and contrary to Congress' legislative intent.

### 2. Whether the Designs Are "Directly Competitive"

Moreover, Labor's narrow focus on the economic relationship between individual machine and tool designs, stripped of their market and manufacturing contexts, precludes a meaningful analysis of their "uses" and "commercial purposes" pursuant to 29 C.F.R. § 90.2, which in turn would demonstrate whether they constitute "directly competitive" articles. *See United Shoe Workers of Am.*, 506 F.2d at 185–86 ("Normally, the term 'directly competitive'

_____

includes entities engaged in agricultural activities.").

invites, in the first instance, a comparison of the *commercial* uses of the products and not their

characteristics . . . .") (emphasis added).  To support the rapid model turnover in the car industry,

manufacturers such as GM require a constant supply of custom-designed machines and tools to

construct assembly lines.  Each of Plaintiffs' designs, therefore, represents a highly specialized

product, much like custom-made jewelry or computer software, that proves essential to the

operation of the car industry.  If Plaintiffs' designs were not "like or directly competitive" with

other designs, logic dictates that GM would not have attempted to off-shore their production,

since employing cheaper foreign labor instead of the Tesco employees to create the designs

would not yield cost savings.  Nevertheless, [[     ]] *See* C.R. 53.  Likewise, if Plaintiffs' design

production were immune to direct competition as Labor claims, off-shoring could not have

affected Plaintiffs' jobs by reducing demand for their designs.  Labor's argument against

Plaintiffs further

> loses its power if considered in the context of custom-made products in more
> traditional industries.  For example, custom-made suits are imported from abroad
> to the United States frequently.  Arguably, one custom-made suit would be
> considered as like or directly competitive with another custom-made suit because
> both suits share substantial similarities and serve a particular demand.

*EDS*, 408 F. Supp. 2d at 1347.  In this case, Plaintiffs produced custom-made machine and tool

designs to satisfy GM's demand.[10]

Even in past determinations, Labor has acknowledged that non-mass-produced articles

can experience direct competition.  In *EDS*, Labor found the software arising from the transfer of

production to Mexico to be in direct competition with that of the plaintiffs even though the

---

[10]Some of Tesco's responses to Labor's inquiries suggest that even within Labor's overly
narrow analytical approach, many of Plaintiffs' designs would qualify as "directly competitive"
with each other, as [[     ]] *See* C.R. 24.  Therefore, a design could be used to produce separate
machines with different functions installed at various points along an assembly line.

plaintiffs in that case produced software custom-tailored to their customers' needs:

> [A] significant portion of the production of software enhancements was shifted to Mexico during the period under investigation. Moreover, while no production of wholly new software occurred in Mexico during the period under investigation, the Mexican workers were being trained in the production of new software during the relevant period and the production of such software now occurs in Mexico. Thus, a shift of new software production to Mexico was also underway. Based on a review of the record developed on remand, the Department determines that the software produced in Mexico is like or directly competitive to that produced at the subject facility.

*EDS Determination*, 71 Fed. Reg. at 18,356; *see EDS II*, 408 F. Supp. 2d at 1347 ("That workers at the Fairborn facility designed and developed software to enhance the existing systems of its single client does not mean that the software now developed in Mexico is not like the software produced by EDS Fairborn."). Plaintiffs assert, and the agency record supports, that Plaintiffs lost their jobs in a nearly identical manner. *See* Pl.'s Mot. J. A.R. 3; C.R. 53. Labor's finding that Plaintiffs' designs are incapable of being directly competitive with other designs is not supported by substantial evidence and cannot be upheld by the court.

### 3. The Designs as "Like" Articles

Finally, Labor's evaluation of whether Plaintiffs' designs, as well as those produced by others, are "like" disregards Labor's own regulatory standards. While 29 C.F.R. § 90.2 defines "like" articles as "those which are substantially identical in inherent or intrinsic characteristics (i.e., materials from which the articles are made, appearance, quality, texture, etc.)," the Agency ignores its own definition and treats the "like" and "directly competitive" criteria as interchangeable. *See Negative Remand Determination*, 70 Fed. Reg. at 45,439 (determining that subject designs are neither "like" nor "directly competitive" due to their ostensible "commercial purposes"). However, 19 U.S.C. § 2272(a) and 29 C.F.R. § 90.2 explicitly distinguish between the two terms. *See* 19 U.S.C. § 2272(a); 29 C.F.R. § 90.2; *see also* 1974 U.S.C.C.A.N. at 7265

("The words 'like' and 'directly competitive' . . . are not to be regarded as synonymous or explanatory of each other . . . ."). Labor cannot breach its own regulation, let alone ignore the statute underpinning it. On remand, Labor must engage in an analysis of whether the designs at issue are "like" products in a manner in accordance with the law.

## V. Conclusion

Given the deficiencies of the Department of Labor's *Negative Remand Determination*, the court hereby remands this case to the Agency for further proceedings not inconsistent with this opinion. The Department of Labor shall file the results of this remand with this court by December 29, 2006, and Plaintiffs will have until January 26, 2007 to file their comments.


    November 9, 2006                                   /s/ Judith M. Barzilay

Dated:_____                         _____

    New York, NY                                        Judge