Slip Op. 08 - 43

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - -X
FORMER EMPLOYEES OF FAIRCHILD SEMI-  :
CONDUCTOR CORP.,
                                     :
                   Plaintiffs,
                                     :
          v.                              Court No. 06-00215
                                     :
UNITED STATES SECRETARY OF LABOR,
                                     :
                   Defendant.
                                     :
- - - - - - - - - - - - - - - - - - -X

Opinion & Order

[Further remand to defendant for reconsideration
 of negative determination(s) regarding plaintiffs'
 eligibility for trade-adjustment assistance.]


Dated:  April 18, 2008


    Allen & Overy LLP (Todd S. Fishman, Chintan V. Panchal and
Sarah V. Dadush) for the plaintiffs.

    Jeffery S. Bucholtz, Acting Assistant Attorney General; Jeanne
E. Davidson, Director, Patricia M. McCarthy, Assistant Director,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice (David M. Hibey); and Office of the Solicitor, U.S.
Department of Labor (Vincent Costantino), of counsel, for the
defendant.


        AQUILINO, Senior Judge:  Pursuant to this court's slip

opinion 07-38, 31 CIT ___ (March 13, 2007), familiarity with which

is presumed, the defendant has filed the Notice of Negative Deter-

mination On Remand (April 27, 2007) of the Employment and Training

Administration ("ETA"), U.S. Department of Labor, which, after

reconsideration on remand, [] affirm[s] the original notice of negative determination of eligibility to apply for worker adjustment assistance for workers and former workers of Fairchild Semiconductor International, Mountaintop, Pennsylvania.

After determining that

a significant number or proportion of the workers in such workers' firm was totally separated and that both sales and production of semiconductor wafers at the subject firm have decreased absolutely[,]

Notice of Negative Determination On Remand, seventh page, the focus

of this notice is whether there were either

1) increased imports during the relevant period . . . of articles like or directly competitive with semiconductor wafers produced by the subject workers or 2) actual or likely imports of articles like or directly competitive with semiconductor wafers produced by the subject workers following the subject firm's shift of semiconductor wafers production abroad.

Id. Whereupon, the ETA proceeds to conclude that the

subject workers at issue here produced a different article from the article produced by the previous [Trade Adjustment Assistance ("TAA")]-certified workers . . . -- semiconductor wafers, not semiconductor devices.

Id., fourth page. Then it affirms its previous determination that

increased imports of finished semiconductor devices cannot be the basis for certification of a petition applicable to workers engaged in the production of semiconductor wafers because those two articles are neither like nor directly competitive with each other.

Id. at seventh – eighth pages.

I

As set forth in slip opinion 07-38, the statutory standard implicated by this reasoning is "articles like or directly competitive with articles . . . produced"[1] by Fairchild.  Counsel for the plaintiffs take the position that this

> finding ha[s] no basis in fact, and [i]s a conclusion based on a fundamental misunderstanding of both the nature of the article produced and the production process.  In finding that the Plaintiffs produced "semiconductor wafers," Labor altogether ignored the Company's repeated and consistent statements that the Plaintiffs produced "discrete semiconductor devices" until they were let go.  Had Labor undertaken more than a perfunctory investigation, it would have found that "semiconductor wafer" is not an accurate description of the article produced, and that instead, the Plaintiffs produced the exact same product as their previously certified colleagues – discrete semiconductor devices.[2]

Both sides refer to and rely on a "primer" which can be found in the underlying administrative record ("AR") entitled *How To Make An Integrated Circuit* and setting forth in thirteen enumerated steps the "process of producing one completely packaged integrated circuit [that] is long, involved and extremely complicated."  AR, p. 32.  The first six entail transformation of raw silicon into polished "wafers" that are ready for installation of actual,

---

[1] 19 U.S.C. §§ 2272(a)(2)(A)(ii), (2)(B)(i) & (2)(B)(ii)(III).
[2] Plaintiffs' Comments on Notice of Negative Determination on Remand, pp. 5-6.

electrical circuitry[3] but which are not of any moment in this matter as there is no contention by either party that Fairchild performed those steps.[4]   Number 7 is a "very complex step, requiring highly sophisticated equipment"[5], that forms on the polished side of a wafer an "epitaxial" semiconductor film less than 1/1000th inch thick with specific electronic characteristics. The next three steps are depicted in the record as follows:



Over the epitaxial film, induce a silicon oxide coating. Over that, place another coating of a "photoresist" lacquer. Over that, place a "mask" with the desired electronic pattern. Now expose the surface to ultraviolet light.



Next, present the surface of the chip to an extremely corrosive gas called a "plasma." This gas eats away the masked portion of the photoresist not exposed to the ultraviolet light and thus etches a circuit pattern on the silicon wafer. The epitaxial surface thus revealed constitutes the channels which, when filled with conductive materials, will function as the chip's "wires."

---

[3] See AR, p. 31.

[4] See, e.g., Plaintiffs' Comments, p. 3; Defendant's Response, p. 4; transcript of oral argument on April 14, 2008.

[5] AR, p. 31.



Add a coating of silicon and then repeat steps 7 through 9 for a second layer of circuitry. You can do this at least 11 times. Between layers you may wish to inlay materials called "dopants" which will vary the resistance of the circuit channels and thus define the function of the finished product.

Number 11 explains that each wafer may contain as many as 1,000 multi-layered circuits that are usually, but not necessarily, identical to each other. The next step, called "scribing" or "dicing", is to cut them apart into "chips" or "dies". See id. Step 12 involves mounting a chip on a stamped lead-wire harness in a process called die bonding and then encapsulating such assembly in a final package. The last step, 13, is to subject the resultant circuit to rigorous testing.

A

The plaintiffs claim that producing working semiconductors has two phases, the second of which is comprised of foregoing steps 11-13, which, "since the 1970s, [have] been performed at a Fairchild facility located in China." Plaintiffs' Comments, p. 10 and n. 1. They also note, however, that "numerous wafers are sold directly to customers in . . . uncut form, and . . . individual chips are 'completely functional with or without the

package.'" Id., n. 1, citing AR, p. 57. Either way, the plaintiffs posit that the manufacturing steps performed at Fairchild's Mountain Top, Pennsylvania ("MTP") facility were 7-10, the diminution of which became the predicate of ETA's previous investigations of eligibility to apply for trade-adjustment assistance in MTP matters TA-W-40,054 (amended, Jan. 4, 2002) and TA-W-53,335 (Dec. 2, 2003). Their complete elimination on or about January 2006, however, has not yet resulted in similar relief for Fairchild's terminal worker-group of performers.

The defendant responds that Fairchild performed steps 7-13 at the Mountain Top facility until 2003, thus producing the finished article, a discrete semiconductor device. Thereafter, steps 11-13 shifted to Asia, with only steps 7-10 continuing at MTP. See Defendant's Response, pp. 4-5. The defendant thereupon concludes that that shift changed the identity of the article produced by the plaintiffs from the finished article to a component of that finished article, a fabricated wafer. Id.

A previous certification, in TA-W-53,335, of former workers at Mountain Top as eligible to apply for trade-adjustment assistance on December 2, 2003 through two years from that date expired just before the current plaintiffs were terminated. See

AR, p. 37.  And the defendant asserts that the petition at bar encompasses a distinguishable worker class that produced semiconductor wafers between January 2005 and December 2005.  See id. at 3.  This distinction and follow-on finding that a semiconductor wafer is not a discrete semiconductor device, or like or directly competitive with such a device, resulted in ETA's Negative Determination On Remand.

B

In this kind of case, the Secretary of Labor's findings of fact are conclusive if supported by substantial evidence.  However, the court, "for good cause shown, may remand the case to such Secretary to take further evidence, and . . . make new or modified findings of fact".  19 U.S.C. §2395(b).  In Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F.Supp. 1111, 1115 (1993), for example, the court

> unequivocally declared that no deference is due to determinations based on inadequate investigations. [*Former Employees of*] *General Electric Corp*. [*v. U.S. Dep't of Labor*], 14 CIT 608 [(1990)]; *United Electrical[,] Radio and Machine Workers of America v. Dole*, 14 CIT 818 (1990).  In both of the aforementioned cases, the court established that although Labor possesses considerable discretion in handling trade adjustment assistance investigations, there exists a threshold requirement of reasonable inquiry.  Investigations that fall below this threshold cannot constitute substantial evidence upon which a determination can be affirmed.

Furthermore, TAA is remedial legislation and, as such, should be construed broadly to effectuate its intended purpose.  E.g., Former Employees of Elec. Data Sys. Corp. v. U.S. Sec'y of Labor, 28 CIT 2074, 2082-83, 350 F.Supp.2d 1282, 1290 (2004)(citations omitted). See also Abbott v. Donovan, 7 CIT 323, 327-28, 588 F.Supp. 1438, 1442 (1984)(the Secretary is "obliged" to conduct his investigation with the utmost regard for the interests of the petitioning workers).

It may be that the investigation per the petition at issue, and the conclusions emanating therefrom, are more in depth and, perhaps, more accurate than those previously drawn.  In TA-W-53,335, the investigation initiated on October 24, 2003, the ETA concluded that there was a shift in production of discrete semiconductor devices from MTP to Korea and China.  See AR, pp. 37-38.  It found that those same devices would be imported back to other U.S. divisions of Fairchild from those countries as early as January 2004, apparently relying on the word of a company official. See id. at 40.  It does not appear that the agency deduced from its investigation pursuant to that prior petition that the articles produced at the Mountain Top facility were being further processed overseas before being imported back into the United States, which is what the plaintiffs now assert.

That same company official, who provided information in that earlier investigation, supplied an *e-mail*, found at AR, page 28, in support of the petition at issue herein.  It states that the article is produced in a two step process: the first is completed at MTP, and the second step is taken overseas.  See id. at 28.  He explains that once that step is completed, the finished semiconductor is sold to customers.  Id.  This representation that further processing is accomplished overseas, identified in this subsequent investigation, appears to have caused the ETA to first evaluate herein whether, with regard to the MTP product,

> there has been or is likely to be an increase in imports of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.

19 U.S.C. §2272(a)(2)(B)(ii)(III).

While the Fifth Amendment to the Constitution forbids discrimination of similarly-situated persons that is "so unjustifiable as to be violative of due process", e.g., Schneider v. Rusk, 377 U.S. 163, 168 (1964), quoting Bolling v. Sharpe, 347 U.S. 497, 499 (1954), agency action is sustainable if it is "rationally based and free from invidious discrimination." Richardson v. Belcher, 404 U.S. 78, 81 (1971), citing Dandridge v. Williams, 397 U.S. 471, 487 (1970).  Here, the plaintiffs

understandably claim that the negative determination results in actionable disparate treatment.   But an inadequate ETA investigation in another matter and resultant potentially-mistaken determination do not require the agency to repeat the same error here.

II

In determining whether imported articles are or would be like or directly-competitive with articles that were produced at Mountain Top, the ETA states that:

> Under the Department's interpretation of "like or directly competitive," (29 CFR 90.2) "like" articles are those articles which are substantially identical in [their] inherent or intrinsic characteristics and "directly competitive" articles are those articles which are substantially equivalent for commercial purposes (essentially interchangeable and adapted to the same uses), even though the articles may not be substantially identical in their inherent or intrinsic characteristics.
>
> While semiconductor wafers are a component part of semiconductor devices, they are not substantially identical in inherent or intrinsic characteristics. Further, because semiconductor wafers are a component part of semiconductor devices, they are not substantially equivalent to each other for commercial purposes.   In addition, the semiconductor wafer has to be further processed before it can be used as a component part of the semiconductor device.

Notice of Negative Determination On Remand, eighth page.  But the regulation referred to, 29 C.F.R. §90.2, also explains that an

imported article is *directly competitive with* a domestic
article at an earlier or later stage of processing . . .
if the importation of the article has an economic effect
on producers of the domestic article comparable to the
effect of importation of articles in the same stage of
processing as the domestic article.

In reviewing the administrative record for support for the conclusion that "those two articles are neither like nor directly competitive with each other", it appears that an inquiry was made on April 11, 2006 in response to the administrative appeal of the initial negative determination(s).  See AR, pp. 57-59.  In the appeal letter, an MTP official states that:

After the product leaves our facility, it is sent
overseas to either be immediately sold as a bare die
device or placed into a package.  Even when the chip is
placed in a package, the essence of the device is never
changed or altered from when it left our facility; it is
simply cut and placed into a package before it returns to
the U.S. for sale.  In all instances, the device is
completely functional with or without the package.  Also,
in each case, the device when imported back to the U.S.
is both like and directly competitive to the
semiconductor wafer chips produced by the Mountain Top,
Pennsylvania facility.

Id. at 57.  A memorandum to the agency file summarizes a phone conversation with that same official to the effect that "semiconductor devices are not like or directly competitive to wafer chips."  Id. at 59.  While the ETA may understand "semiconductor devices" to be the product developed through step

13, supra, it is unclear what the meaning of "wafer chips" is in this context.  Perhaps the investigator was referring to the product last produced at MTP.  However, it is unlikely that the company official intended such a meaning.  Moreover, his purported acknowledgement is in discord with his letter stating "the device when imported back to the U.S. is both like and directly competitive to the semiconductor wafer chips", supra.[6]

*Nobel Prize*-winning physicist Richard P. Feynman is reported to have once said there is a "difference between knowing the name of something and knowing something."  Here, while the "name of something" may not be detrimental to following the findings in the Notice of Negative Determination On Remand, it is crucial to this court's deciding whether this result is "supported by substantial evidence."  19 U.S.C. §2395(b).  Given the current record, in light of the definition of "like or directly competitive" set forth in 29 C.F.R. §90.2, supra, this court cannot yet do so.

---

[6] The court notes in passing that the primer, *How To Make An Integrated Circuit*, defines "chip" as a "small piece of silicon that is a complete semiconductor device or integrated circuit", suggesting that a "chip" is the final product (steps 1-13), but use of the word "chip" in step 11 implies that the wafer is referred to as a chip after it is cut during that step.

III

Although the ETA has considerable discretion in conducting its investigations of TAA petitions,

> there exists a threshold requirement of reasonable inquiry. Investigations that fall below this threshold cannot constitute substantial evidence upon which a determination can be affirmed.

Former Employees of Chevron Prod., Co. v. U.S. Sec'y of Labor, 26 CIT 1272, 1274, 245 F.Supp.2d 1312, 1318 (2002), citing Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, supra. Here, the record is contradictory and unclear. Seemingly, the determination on remand fails to understand the nature of the article at issue in this action. Additionally, the reasoning for the determination with regard to "like or directly competitive with" appears contrary to ETA's own codified explanation thereof.

Hence, the court is once again constrained to remand this matter to the agency for further investigation as to whether or not there were

> increased imports during the relevant period . . . of articles like or directly competitive with semiconductor wafers produced by the subject workers or [] actual or likely imports of articles like or directly competitive with semiconductor wafers produced by the subject workers following the subject firm's shift of semiconductor wafers production abroad.

The defendant may have until June 6, 2008 to conduct such investigation and report the results thereof to the plaintiffs and the court.

So ordered.

Dated:  New York, New York
        April 18, 2008


                                    /s/ Thomas J. Aquilino, Jr.
                                        Senior Judge